Kevin TINNEY

v.

Harle TINNEY et al.

No. 99–345–Appeal.

Supreme Court of Rhode Island.

April 27, 2001.

David N. Cicilline, Bristol, for Plaintiff.

Keith B. Kyle, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this civil action, Kevin Tinney, a.k.a. Kevin Koellisch (Kevin or plaintiff),[1] appeals from a Superior Court judgment en-

1. Throughout this opinion, we refer to various parties and individuals by their first names for the purposes of convenience, and in doing so no disrespect is intended.

tered after a nonjury trial on his complaint seeking partition of two adjacent parcels of land (collectively Belcourt), including one large lot (parcel 1) upon which the mansion Belcourt Castle rests and one smaller unimproved lot (parcel 2). The trial justice denied the plaintiff's claim to partition parcel 1, and voided his proprietary interest in that parcel. As to parcel 2, the trial justice upheld the plaintiff's possessory interest in it but ordered him to sell this interest to Donald and Harle Tinney (Tinneys or defendants) for $65,011. The trial justice also ordered the plaintiff to vacate Belcourt. For the reasons hereinafter set out, we affirm the judgment of the Superior Court and deny the plaintiff's appeal.

2. One of the trial exhibits permitted the Superior Court trial justice to make eloquent note of its historic and troubled past. He said:
 "The mansion at Belcourt, which majestically sits on the property, was originally built for Oliver Hazard Perry Belmont ('Belmont'). Belmont hired architect Richard Morris Hunt in the late 1890s to build a 60–room Louis XIII summer cottage. Originally, Belmont named the property Belcourt. Richard Morris Hunt had an impressive resume of architectural plans as he designed Newport's own Griswold House, Fairlawn, Marble House, Ochre Court, and The Breakers. Oliver is quoted as saying that 'Richard Morris Hunt is the greatest architect alive and I want the best for Belcourt.' During this time period, Belmont and William K. Vanderbilt were best friends. Alva Vanderbilt divorced her husband in 1895 amidst rumors of her being in love with Belmont. Allegedly, however, it was Alva who was tired of her husband's philandering ways. Nonetheless, once Belmont and Alva married, she had free reign to reconstruct and redecorate Belcourt as she desired. Prior to Alva's death, she sold Belcourt to her brother-in-law Perry Belmont.
 "Perry owned Belcourt from 1925 until 1940. Since Perry equated Belcourt as the proverbial 'White Elephant,' he sold the property to George Waterman in 1940 on the condition that Waterman pay a penny on every 1890 dollar, and that he restore the property to the original plans due to his

# I

## Facts and Case Travel

In 1956, Harold and Ruth Tinney purchased Belcourt Castle, a sixty-room Louis XIII summer cottage with the majestic trappings of a European palace, on Bellevue Avenue in Newport. When they purchased Belcourt Castle, it was no longer the posh Newport showplace that its designer and architect, the famed Richard Morris, had intended for its original owner, Oliver Hazard Perry Belmont, in the late 1890's, and neither the years since, nor its varied owners, had been kind to Belcourt Castle.[2] Harold and Ruth, how-

dislike of his sister-in-law Alva. Waterman had planned to use Belcourt as an antique auto museum, but zoning laws and protesting neighbors prevented the realization of his plans.
 "In 1943, Waterman sold Belcourt to Edward Dunn. At the time of purchase, none of the rooms in Belcourt were habitable. Although Dunn never lived at Belcourt, he maintained the property until 1954 when he sold it to Louis and Elaine Lorillard.
 "The Lorillards purchased Belcourt with a business plan in mind of conducting the jazz festivals on the property. Some of the citizens of Newport did not share the Lorillards' interest in this type of music and successfully campaigned to prevent any further jazz festivals at Belcourt. In 1956, the Lorillards sold Belcourt to the Tinney family.
 "The Tinney family purchased Belcourt in 1956 as a family restoration project, renaming the property Belcourt Castle. In 1957, Belcourt was opened to the public as a museum. Through the years, the Tinney family has had to overcome financial hardships and challenges from the neighbors to their right to operate a museum. Belcourt is now an eclectic showcase of furnishings, paintings, sculptures, and other artifacts from many countries displayed in ten rooms on two floors. To this date, Belcourt continues to be a home to the Tinney family, as well as a museum opened to the public and a banquet facility. Since 1972, the museum has been managed and leased

ever, were able to visualize more in Belcourt Castle than their Newport neighbors, and they persevered in their dream of restoring Belcourt Castle to its former regal splendor and opening it to the public as a museum. In 1957, Harold, Ruth and their son, Donald, were able to open Belcourt Castle to the public. By 1960, they were beginning to realize public acceptance of their venture, and in the summer of 1960, they hired a tour guide, Harle, a young Newport girl, to assist them. In December of that year, Donald and Harle married, and Harle moved into Belcourt Castle with Harold and Ruth, who were then all living in the one habitable apartment in Belcourt Castle. All went well with the four Tinneys and Belcourt Castle primarily because of the long hours they spent operating a stained-glass window business on the premises. They used the earnings from that business to keep Belcourt Castle open to the public.

In 1974, plumbing problems surfaced at Belcourt Castle. Repair costs were estimated to be about $10,000, which was beyond the ability of Belcourt Castle to meet. Kevin Koellisch (Kevin), a local itinerant handyman, plumber of sorts, and jack of all trades, was recommended to Harold.[3] Despite Harold's "not lik[ing] Kevin from day one," Harold hired Kevin to do the plumbing work for $600. Shortly thereafter, Kevin was hired to do other work on the Belcourt Castle heating system, and the Tinneys, in appreciation for Kevin's work and low prices, began inviting Kevin to have dinner with them at Belcourt Castle as a sign of their appreciation. Within six months, however, Kevin had talked the Tinneys into letting him clean up, reno-

vate, and move into an apartment in the south wing of Belcourt Castle. In 1975, Kevin lived in one room in the apartment and rented out the apartment's other rooms to a "bunch of roommates" to help pay the rent due to the Tinneys. Kevin was soon considered to be the general-maintenance manager for the building and grounds, and was invited to have his meals with the Tinneys in Belcourt Castle's main dining room.

From 1975 to 1989, Kevin was in and out of Belcourt Castle, being self employed at different jobs in Massachusetts and other states. On those frequent occasions when Kevin was away from Belcourt Castle, sometimes for months at a time, the Tinneys occasionally would rent out his south wing apartment. If, when Kevin returned, his apartment happened to be rented out, he would then stay in the "Cream Room" at Belcourt Castle or with Donald and Harle in their apartment.

Kevin's excursions away from Belcourt Castle were not, however, always for purposes of perfecting his capabilities as a handyman. A libertine and a bounder of sorts, he apparently was attracted to elderly ladies, and became quite successful in cleverly relieving them of their worldly goods. For example, in 1982, when Kevin was just thirty-one, he was able to relieve the elderly lady who owned the Fife & Drum Bar in Providence of her stock ownership in that business by means of a promissory note that he never honored. He later acquired an apartment building in Massachusetts from another elderly lady by means of a purchase money mortgage

---

by the Royal Arts Foundation (RAF), a nonprofit corporation. Belcourt has continued its operation through the rents received from the lease with RAF, as well as funds derived from tours, donations, and a stained glass and restoration business."

**3.** Kevin was not a licensed plumber but did plumbing work under a license issued to a Robert Cox.

that never was repaid.[4]

Having thus sharpened his ancillary skills, Kevin by 1984, was living in his south wing apartment in Belcourt Castle and working with the Tinneys. He was soon given the position of general manager of Belcourt Castle and was permitted to hire employees, handle financial matters and do general-maintenance work.

Harold, the patriarch of the Tinney family, died in 1989. At the time of his death, he had been married to Ruth for some sixty years. Ruth was "devastated" by the loss of her husband. Her son, Donald, at this time was also suffering from depression, anemia, and alcoholism, all of which did little to help console Ruth. In those unfortunate circumstances, Kevin's relationship with his employer, Ruth, underwent a rapid and unseemly fulgent metamorphosis, which would later create significant ramifications for the ownership of Belcourt.[5] By most accounts of the trial witnesses, Kevin, in the wake of Harold's death, began to ingratiate himself with Ruth, who was some forty-five years older than Kevin. He took her dancing, took her horseback riding, took her on overnight trips, was seen "rubbing" her and kissing her in public and otherwise he was acting overly solicitous toward her, even though Kevin, at that time, still had a male domestic partner living with him in his south wing apartment. Within a year or so after Harold's death, and while Ruth was still seriously depressed over his death, and the near fatal illness of her son, Donald, Kevin indicated that he wanted to be adopted by Ruth and become part of the Tinney family. He told the then vulnerable Donald that unless he was adopted, he was going to leave Belcourt within a year. He also told friends that he always considered himself to have been a member of the Tinney family as far back as the "70's." On October 11, 1990, Ruth who was then eighty-four years of age, apparently succumbed to Kevin's oleaginous charm and adopted Kevin, who was then thirty-seven. Kevin immediately assumed the surname "Tinney" much to the dismay of his natural mother, who was still living and who admonished him that people would regard him as having "sold his name for a buck." On April 18, 1991, some six months after the adoption proceeding, Ruth, Donald, and Harle executed a deed conveying to Kevin a one-fourth joint interest in parcel 1 of Belcourt. That acquisition by Kevin of his one-fourth joint interest served to spawn the onset of the Belcourt Castle intrigue and wrangling over its ownership and generated the litigation that brings this appeal to this Court.

In 1993, Ruth, who was then eighty-six years of age, suffered a stroke, and because of her age, became debilitated. On September 10, 1995, Kevin and the Tinney family decided to dispose of Belcourt Castle, and entered into a one-year listing agreement with a local realtor, Private Properties, to sell it. However, there were no buyers. In December 1995, Ruth died. Title to Belcourt Castle now vested in Kevin, Harle and Donald as joint tenants, each owning a one-third joint title interest.

By March 1997, the long-strained relationship between Kevin and the Tinneys had deteriorated to such an extent that Harle and Donald, to prevent Kevin from

---

4. The names of the unfortunate ladies have been omitted to respect their privacy.

5. At the time of Harold Tinney's death, Ruth Tinney, Donald Tinney and Harle Tinney owned parcel 1 of Belcourt, containing the mansion, as joint tenants, each possessing a one-third interest.

acquiring any of their interest in Belcourt Castle, severed their joint tenancy with Kevin by quitclaiming their interest in parcel 1—containing the mansion—to Amy Manning (Amy), who then quitclaimed her interest in parcel 1 back to Harle and Donald, who took their title interest as tenants by the entirety. Amy is the daughter of the Tinneys' longtime family attorney Edward Manning, who had arranged for and prepared the conveyance documents. As a result of these conveyances, Donald and Harle now owned a two-thirds interest in parcel 1 as tenants by the entirety, and Kevin retained his one-third title interest with little chance, if any, except by conveyance, of ever acquiring Donald or Harle's interest in Belcourt Castle.

Kevin, who also held a real estate broker's license and who obviously was aware of the title consequences resulting from Donald and Harle's taking title as tenants by the entirety to their two-third's interest in Belcourt Castle, was not content with being left his mere one-third interest in Belcourt Castle. He began to threaten both Harle and Donald with accusations and court actions concerning their handling of Belcourt matters. As a result of these threats, Donald's health once again began to deteriorate, and after succumbing to Kevin's threats and accusations, Donald and Harle capitulated, and executed a quitclaim deed whereby they agreed to reconvey parcel 1 to themselves and Kevin as joint tenants. They did so in April 1997. Kevin and the Tinneys, who were then able to obtain mortgage financing on Belcourt Castle about five months later, on September 5, 1997, also decided to purchase as joint tenants what is now known as parcel 2 of Belcourt, an unimproved lot abutting Belcourt Castle to the south. Donald and Harle, however, continued to be suspicious of Kevin's intentions with regard to Belcourt and were uneasy in their roles there with Kevin.

In November 1997, Donald and Harle decided once again to sever their joint tenancy with Kevin. Thus, they again conveyed their two-third title interest to Belcourt to themselves as tenants by the entirety. As a result, Kevin was left yet again with his isolated one-third ownership interest.

On November 25, 1997, Kevin retaliated against Donald and Harle's title shifting and began carrying through on his earlier threats to them. He filed a civil action in the Newport Superior Court on behalf of himself and the Royal Arts Foundation, a nonprofit corporation that managed the museum at Belcourt. In that action, he alleged that Harle and Donald had embezzled and converted foundation funds and property. Donald and Harle answered Kevin's complaint, denying any wrongdoing on their part, and filed a counterclaim in which they leveled a barrage of claims against Kevin.[6]

---

6. The counterclaim by Donald and Harle prayed for injunctive and monetary relief. Harle also filed, in July 1998, a claim for injunctive and monetary relief against Kevin, alleging in part that Kevin's "constant" harassment drove Donald, who suffered from clinical depression and alcoholism, into an alcoholic coma on July 2, 1998. It also alleged that the "adoption petition was the result of many years of intimidation, undue pressure, misrepresentation and other actions by Kevin Koellisch upon Ruth Tinney, for purposes of Kevin Koellisch either being adopted by Ruth Tinney or being married to Ruth Tinney for purposes of procuring for his own benefit a share in Belcourt Castle and the various artifacts contained therein." It also alleged that since the death of Ruth, Kevin sought to procure a greater interest in Belcourt by engaging in activities that "amount to the constant harassment of the Tinneys and their employees, the filing of frivolous and untrue lawsuits, filing of false police reports, or making false allegations to the City Council of the City of Newport and

Shortly thereafter, in March 1998, despite his alleged "dream" of wanting to keep Belcourt under the ownership of the Tinney family and keeping it open as a museum, Kevin then filed a second complaint (C.A.98–116), this time seeking the partition of Belcourt by the Superior Court in Newport. In his complaint, Kevin alleged he possessed a one-third joint interest with Donald and Harle in both parcel 1, as evidenced by the quitclaim deed recorded April 11, 1997, and in parcel 2, as evidenced by the warranty deed recorded on September 5, 1997, and that Donald and Harle had an undivided two-thirds interest in both parcel 1 and parcel 2 as tenants by the entirety. Kevin also alleged that he and the Tinneys could not agree "on a sale of the premises" and that the real estate could not "be divided by metes and bounds." That complaint filed, pursuant to G.L.1956 § 34–15–16, sought to have a commissioner appointed by the Superior Court to "divide or sell the property and order the immediate sale of the real estate; and, pursuant to R.I.G.L. 34–15–18, order the partition of funds resulting from this sale."[7]

The defendants, Donald and Harle, duly filed their answers objecting to Kevin's complaint seeking partition of the Belcourt properties. They contended in their amended answers that the properties could be divided by metes and bounds, and asserted affirmative defenses alleging breach of agreement, accord and satisfaction, lack of equitable entitlements to partition, the procurement by Kevin of his title interest and claims by means of undue influence, duress and/or fraud, and requested "such other" relief as the trial court might deem "just and appropriate." Notwithstanding that a partition action is an equitable proceeding in which there is no right to a jury trial, the Tinneys nevertheless claimed a trial by jury.

On April 16, 1999, Donald and Harle had moved to amend their answers to Kevin's suit for partition by adding thereto the affirmative defense that the deeds conveying to Kevin his interest in Belcourt Castle and the lot adjoining Belcourt Castle had been procured by him through "undue influence and/or duress and/or fraud" and should be declared "null and void, canceled and/or set aside." That motion to amend was not objected to and was later granted.

On April 26, 1999, before commencing trial on Kevin's suit for partition, the trial justice conducted a pretrial conference with the trial attorneys. At that pretrial conference, the parties agreed that Kevin's complaint for partition would be tried by the trial justice sitting without a jury and

---

other regulatory bodies relative to the business activities being carried out at Belcourt Castle * * * to harm the plaintiffs and induce them to capitulate to the defendant's demands."

7. General Laws 1956 § 34–15–16, "Order of sale," provides, in pertinent part:

"In an action for partition, the superior court may, in its discretion, upon motion of any party to the action, order the whole premises sought to be divided, or any particular lot, portion, or tract thereof or the interest of the plaintiff or plaintiffs or of the defendant or defendants in the whole premises, or in any particular lot, portion, or

tract thereof, to be sold, either at public auction or by private contract * * *."

Section 34–15–18, "Division of proceeds of sale—Share set aside for absent or unknown parties," provides, in relevant part:

"In case of a sale under this chapter, the proceeds of the sale shall be divided, under the direction of the court, between the parties entitled thereto, in lieu of their interest in the estate ordered or decreed to be sold, and the portion of the proceeds of sale to which any party or person absent from the state or unknown and not appearing to claim the proceeds, may be entitled, may be invested for that person by the commissioners * * *."

that two other pending cases involving Kevin, Donald and Harle, C.A. 97–516 and C.A. 98–2722, would be dismissed without prejudice. That left for trial only Kevin's suit for partition. Thereupon, on April 26, 1999, trial commenced on Kevin's complaint seeking partition of Belcourt, and Donald and Harle's affirmative defenses seeking to set aside the deeds to Kevin upon which his partition claims were based. Trial proceeded before a Superior Court trial justice sitting without a jury. In the presentation of Kevin's case, only Kevin and Robert Magnuson, a real estate appraiser, testified in support of the partition claim.

Kevin attempted to show that because of his devotion to Belcourt and the Tinneys' affection for him, Ruth had adopted him as a son, and the Tinney family had added Kevin's name to the deed as a joint-tenant to Belcourt Castle. Subsequently, however, Kevin also testified that his dream of maintaining Belcourt as a public museum started to unravel as his relationship with the Tinney family deteriorated.

Under cross-examination, Kevin acknowledged that after Harold died and before his name was added to the Belcourt Castle deed, he had taken overnight trips with Ruth, that he had danced with her, taken her horseback riding, and kissed her in public. He steadfastly denied that Ruth was distraught after Harold, her husband of sixty years, had died. He also denied telling Ruth that he would leave Belcourt, and claimed only that he had told Donald he would leave if Ruth did not adopt him. He also admitted to peccadilloes with two

other elderly women in which he obtained property from them in what appeared to be suspicious business transactions,[8] and further testified that he understood the different ways to jointly own property and the significance of various ways of holding title.

Robert Magnuson, a property appraiser, also testified in support of Kevin's claim for partition. He testified that he did not believe the Belcourt property could be "separated" or that the lots could be "subdivided."

In defending against Kevin's partition claim, and in support of their affirmative defenses and counterclaims, Donald and Harle presented eleven witnesses, including relatives, friends and employees of Belcourt.[9] Those witnesses testified that, prior to Harold's death, Ruth was a strong-willed leader of Belcourt who ran the family business closely and demanded a close-knit family loyalty. She was described by these witnesses as a "matriarch," a "very domineering woman," a "Victorian lady," and "very demanding." One witness, Mark Malkovich (Malkovich), the General Director of the Newport Music Festival for the past twenty-five years and a Tinney family friend for some twenty-five years, testified that Ruth "before the death of Harold, I would say she was somewhat imperious. She was the grandame [sic] of Belcourt Castle. She dressed beautifully. She handled herself well."

Certain defense witnesses, including Malkovich, testified that after Harold's

---

8. The trial justice found that Kevin had a prior history of ingratiating himself with elderly women and profiting financially therefrom.

9. David Betzer, a nephew of Ruth Tinney, Keith Greene, a longtime employee of Belcourt, Gregory Beals, another employee of Belcourt, Keith Henry, a friend of the Tinneys, Lucy Rouse, an employee of the Royal Arts Foundation, Edward Manning, the Tinney's past lawyer, Mark Malkovich, a family friend, Ann Baker, a friend, David Baker, a family friend, Ellen Brady, an employee of the Royal Arts Foundation, and Harle all testified at trial.

death, which was "devastating" for Ruth, she became "depressed, lonesome, [and] out of the [*sic*] control." Malkovich testified in particular that "She cried very easily. We'd have a meeting; and in the meeting, in the middle of the meeting, she would start to cry; and I thought that she became sort of little-girlish." Harle also testified that Donald was very sick at this time and suffered from alcoholism, depression, and anemia, and his condition weighed upon Ruth's depression.

The trial testimony also disclosed that Ruth's vulnerability had become apparent to Kevin, and after Harold's death, but before his adoption or addition to the Belcourt Castle deed, witnesses observed that Kevin had begun to "ingratiate" himself and "solicit" Ruth in an inappropriate manner that would have never been tolerated by Harold. Gregory Beals (Beals), an employee of Belcourt for over fifteen years, testified that in the time leading up to the addition of Kevin's name to the deed, Kevin "doted on her constantly, called her mom every time he addressed her." David Betzer (Betzer), a nephew of Ruth, testified that Ruth and Kevin often would be "holding hands, sometimes walking arm-in-arm, kissing, not passionately, but it was uncharacteristic of her, in my opinion. * * * Well, knowing her all of my life, she, as far as being a warm, affectionate, kissing, hugging type of person, she was never ever like that, never. Certainly not in public and not outwardly." Malkovich testified that Kevin "was extremely solicitous of Ruth in a way I felt almost unctuous." It was around this time that Betzer testified that Ruth confided in him, "that she was glad to have a lover in Kevin." Lucy Rouse, an employee of the Royal Arts Foundation, also testified that

Kevin had threatened to leave Belcourt and said that Kevin said, " 'I told mom that, if she didn't adopt me, that I was leaving.' "

The trial evidence also disclosed that, after Kevin was adopted and had his name added to the deed, Kevin began to distance himself from Ruth and no longer worked as extensively as he had before at Belcourt. Beals testified in particular that "he didn't seem to dote on her quite as much. He took more trips; he wasn't as present as much as he had been before."

In addition, Harle also testified. She testified that she signed the deed conveying the Tinneys' interest in Belcourt Castle back to joint tenancy with Kevin in April 1997 because Kevin was threatening all kinds of court actions against her and Donald, including that Harle was an embezzler and that she had murdered Ruth by turning off her oxygen supply when Ruth was last hospitalized.[10]

Other trial witnesses testified that Kevin had also made various admissions to them about his ulterior motives for being at Belcourt. Keith Greene, an employee at Belcourt, testified that Kevin told him, before the adoption, that " 'I struck a gold mine.' " Malkovich testified that Ruth told him she regretted adopting Kevin,

> "said how sorry she was; that she made a big mistake; and that there was a lot of trouble; and that she was very sorry that she did that. I remember my own reaction at the time being—thinking to myself, Oh, Ruth has come back to herself. Because prior to that, I just felt that she was in a fantasy-land."

Harle testified also that Ruth had informed her that "Kevin wants to marry me" and that she told Ruth that it was not

---

**10.** Harle also testified that Kevin reported to the City of Newport that she was conducting an illegal catering business at Belcourt.

right. She said she told Ruth this because Ruth was "84 years old and [Kevin] was 39, and he had somebody [Roger Bisson] living with him on the third floor." Harle testified that when she confronted Kevin about what Ruth had said, he told Harle that the marriage "would put me in a better position." [11]

Kevin's counsel during trial made great effort to rebut the evidence that had been presented to prove that Kevin had exerted undue influence on Ruth, Donald and Harle. During his cross-examination of Harle, he asked her a series of questions seeking to establish that she signed the 1991 deed transferring an interest to Kevin freely. While Harle acknowledged that she signed the 1991 deed and that no one "forced" her to sign the deed, she indicated that there was a "strong influence from mom."

Kevin, after the close of the defendants' case, was recalled to rebut the damaging evidence of his interactions with Ruth. He sought to show that, *inter alia*, he did not seek to marry Ruth, that any "kissing" that took place was familial and proper, that his work did not diminish after being adopted or placed on the deed, and that he

did not make any threat to Ruth that he would leave Belcourt if she did not adopt him.[12] Kevin also denied ever threatening or coercing Donald and Harle to execute the April 1997 deed wherein his name was added as part owner of Belcourt Castle.

Upon completion of the trial, the trial justice, in a thirty-six page-decision, that comprehensively discussed the history of Belcourt, the witnesses' testimony and the applicable law, rejected Kevin's request to partition. The trial justice found that Belcourt could not be divided by metes and bounds based upon the uniqueness and history of the property, the agreement of the parties, and the testimony of the appraiser. The trial justice also found that Donald and Harle had failed to prove their affirmative defenses of breach of agreement, accord and satisfaction, lack of equitable entitlement to partition, estoppel, irreparable harm, fraud and duress.

However, the trial justice found that Donald and Harle had proven their claim of undue influence on the part of Kevin concerning the signing of the April 1991 and the April 1997 deeds. He found that the testimony of the trial witnesses called by Donald and Harle to be most persua-

---

**11.** There were also allegations, *inter alia*, that Kevin embezzled money, improperly converted business funds for personal use, and fraudulently opened a line of credit with a financial institution.

In addition, Malkovich testified that Kevin's allegations that Harle embezzled money were not true and that he made the allegations without properly notifying the Royal Arts Foundation. He also indicated that, at one meeting of the Royal Arts Foundation, in which Kevin was attending, Malkovich asked his lawyer and the Newport police to attend because "there was a dangerous situation" and "I felt that Kevin was capable of anything."

Malkovich also testified that: "The only good part about growing older is that you suddenly tell the truth; and that in my opin-

ion, Kevin was a dangerous con artist; that he had conned Mrs. Tinney, conned the whole family."

**12.** Despite this denial, Kevin did under cross-examination earlier testify unequivocally that:

"Q: [D]idn't you at one point threaten to leave Belcourt, if Ruth Tinney did not adopt you?

"A: Yes. I did say to my brother Donald Tinney, he was the one who had to decide whether or not the adoption would go through and mom objected, the lawyers objected, saying that he didn't have any right in it, to decide whether she wanted to adopt me or not.

* * *

"If he didn't think I was a member of the family and didn't think I should be a Tinney, in a year, I would leave."

sive, particularly that of Malkovich and Harle, and that the testimony of Kevin was unpersuasive and not credible. He found that at the time leading up to the signing of the April 1991 deed Ruth was devastated by the death of her husband, suffered from depression and loneliness, and that she was involved in a very intimate relationship with Kevin. He also found that "Kevin preyed on Ruth's situation and threatened Ruth that he would leave Belcourt after gaining her confidence and dependency" and that "Kevin was a bounder and a con artist seeing Belcourt as his own personal 'gold mine.'" He also found that the condition of the other members of the family, Donald and Harle, was one "rife with opportunity" for someone to unduly influence them because of Donald's sickness and the control that Ruth exerted over them. He also found that Kevin had threatened Donald and Harle with various legal and penal actions if they did not reinstate the joint tenancy by signing the April 1997 deed.

Accordingly, the trial justice found that the April 1991 and the April 1997 deeds were procured through undue influence exercised by Kevin upon Ruth, and upon Donald and Harle. He concluded that the clear and convincing evidence in this case "warrants that the Court set aside both the April 1991 and the April 1997 deeds." However, the trial justice found that the September, 1997 deed to Kevin, Donald and Harle for parcel 2, the lot adjoining Belcourt Castle, was not procured by any undue influence and, thus, was a valid deed and that Kevin was entitled to one-third of its value. He further ordered that since Belcourt was a historical landmark and had been the home of the original Tinney family for over thirty years, that Donald and Harle would have the option of buying out Kevin's share within six months for $65,011. He also ordered Kevin to vacate Belcourt within one month.[13]

■ Kevin timely appealed to this Court, seeking to set aside the final judgment of the Superior Court and to have judgment entered in his favor or, alternatively, to have the case remanded for a new trial. On appeal to this Court, Kevin has raised four issues:

I. Whether the trial court erred by admitting hearsay evidence over plaintiff's objection.

II. Whether the trial court improperly surprised plaintiff when it *sua sponte* converted defendants' affirmative defense of undue influence into a counterclaim and granted affirmative relief without notice to plaintiff of its intent to do so.

III. Whether the trial court denied plaintiff the right to a jury trial on the legal issues after it *sua sponte* transformed the affirmative defense of undue influence into a counterclaim.

IV. Whether the trial court misapplied the law and overlooked material evidence in finding that Kevin had exerted undue influence upon Ruth, Donald and Harle.

We consider these contentions in the order raised by Kevin, noting as we do that in our review of a decision made by a trial justice sitting without a jury we accord great deference to the findings of credibility and fact made by the trial justice, *Canario v. Culhane*, 752 A.2d 476, 479 (R.I. 2000), and in the absence of a showing that he or she overlooked or misconceived material and relevant evidence or was clearly wrong we will not disturb those findings. *Burke–Tarr Co. v. Ferland Corp.*, 724 A.2d

---

13. A motion to stay execution of this judgment pending appeal was granted, and Kevin continues to reside at Belcourt.

1014, 1018 (R.I.1999). Kevin in this appeal does not question our standard of review but as we understand from his appellate contentions, he argues that the trial justice did overlook and misconceive material evidence and clearly erred in his findings.

## II

### Hearsay Evidence

Kevin first asserts that the trial justice erred in admitting hearsay evidence. He contends that three statements by Ruth and a letter to the Newport police written by Malkovich were inadmissible hearsay. The three statements challenged on appeal concerned Malkovich's testimony that Ruth had told him that the adoption was a "mistake;" Betzer's testimony that Ruth had informed him that she was "glad to have a lover in Kevin;" and Kevin's testimony that Ruth told him not to "open" an envelope that may have contained her will.[14] Kevin faults the trial justice for improperly admitting those three statements under Rule 804(c) of the Rhode Island Rules of Evidence.[15] He argues that the trial justice erred by failing to cite to Rule 804(c) and by neglecting to make the requisite finding of good faith under Rule 804(c). We disagree.

We first note from the trial record that no proper objection had been ever

14. The statements were posed, respectively, to Kevin, Betzer, and Malkovich:

> (*Re: Kevin's Testimony*) "Q: When she gave you that envelope, and she told you not to open that envelope until after her death; correct?
> "Mr. D'Addario: Objection.
> "The Court: Why?
> "Mr. D'Addario: It's hearsay. He's bringing in what somebody said.
> "The Court: She's deceased now, right? I'll allow it.
> "Mr. D'Addario: This isn't a dying declaration.
> "The Court: Did you receive any instructions from the decedent? Did you receive any instructions from Ruth Tinney?
> "The Witness: Yes, [y]our honor.
> "The Court: And what were they?
> "The Witness: Not to open up the envelope.
> " * * *
> (*Re: Betzer's Testimony*) "Q: After Harold's death, and before the adoption of Kevin Colish [*sic*], did you ever have occasion to talk with Ruth about her relationship with Kevin Colish [*sic*]?
> "A: I did, yes.
> "Q: What did she say to you about that?
> "Mr. D'Addario: Objection.
> "The Court: I'll allow it.
> "The Witness: The one thing that comes to mind, and this is—this is the only conversation I had with her about it, because after this, I didn't know how to handle it, quite frankly. She made the statement to me that she was glad to have a lover in Kevin.
> " * * *

> (*Re: Malkovich's Testimony*) "Q: And did you have occasion to, during the course of that conversation with her, speak to her about having adopted Kevin Colish [*sic*]?
> "A: We did, yes.
> "Q: What did she say to you?
> "A: She said how sorry she was; that she made a big mistake; and that there was a lot of trouble; and that she was very sorry that she did that. I remember my own reaction at the time being—thinking to myself, Oh, Ruth has come back to herself. Because prior to that, I just felt that she was in a fantasy-land."

15. Rule 804(c) of the Rhode Island Rules of Evidence, *"Declaration of Decedent Made in Good Faith,"* provides:

> "A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant."

Although the plaintiff concedes that, under this rule, the trial justice need not "observe ritualistic procedures" or need not make "formal findings on the record" to comply with Rule 804(c), the plaintiff obliquely contends that the "trial court's actions must still signify good faith." However, since we dispose of the matter on alternative grounds, we need not address this contention further.

made to the three challenged statements. "According to our well-settled 'raise or waive' rule, issues that present themselves at trial and that are not preserved by a specific objection at trial, 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal.'" *State v. Anderson,* 752 A.2d 946, 948 (R.I.2000); *State v. Morris,* 744 A.2d 850, 858–59 (R.I. 2000); *see also* 1 *McCormick on Evidence* § 52 at 225 (5th ed. Strong 1999) ("[i]f the judge *overrules* a general objection, the objecting party may not ordinarily complain of the ruling on appeal by urging a ground not mentioned when the objection was made at trial"); 1 Wigmore, *Evidence in Trials at Common Law* § 18 at 818 (1983) ("The cardinal principle (no sooner repeated by courts than ignored by counsel) is that a general objection, if overruled, cannot avail the objector on appeal"). In this case, plaintiff's counsel failed to offer any objection whatsoever to Malkovich's testimony, relating that Ruth had told him that the adoption was a mistake. Concerning the question put to Betzer, about whether Ruth had made a statement to him indicating that she had been involved romantically with Kevin, plaintiff's counsel only noted his "objection," without specifying any particular ground or reason for the objection. Again while Kevin was being cross-examined about the

will and envelope, the plaintiff failed to properly challenge the admission of that evidence under Rule 804(c), but instead simply objected that the statement had not met the requirements of Rule 804(b)(2) concerning a dying declaration.[16] Had plaintiff's counsel made a *proper objection* or given adequate reason for his objection, the trial justice may have been alerted to what the objection was based upon and might have sustained the objection or at least may have provided the reason for its admission upon which this reviewing Court could then adequately determine its admissibility. *See* 1 *McCormick on Evidence* § 52 at 225 (one purpose of requirement of specific objection is to make a "proper record for the reviewing court in the event of an appeal"). Viewing the record as it stands now, the trial justice may have admitted the testimony under Rule 804(c) or for other adequate reason. The plaintiff simply seeks to raise an issue now here on appeal that was not adequately raised below by presuming now the basis for the evidence's admission and tailoring his objection to that presumed basis. Absent proper objection to the three questions, the answers thereto constituted proper evidence for the trial justice to rely upon in arriving at his decision.[17] *See also* 1 *McCormick on Evidence* § 52 at 225–26.

---

**16.** Rule 804(b)(2) provides that hearsay evidence is not inadmissible if the declarant is unavailable as a witness and, "In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be his or her impending death."

**17.** In *Burns v. Janes,* 121 R.I. 343, 348–49, 398 A.2d 1125, 1128 (1979), we provided that: "It is well settled that hearsay evidence to which no objection is offered is entitled to be treated as if it were legally admissible and to be accorded whatever probative weight the

factfinder believes it deserves." *See also McAree v. Gerber Products Co.,* 115 R.I. 243, 257, 342 A.2d 608, 615 (1975); *Desrosiers v. Hemingway Bros. Interstate Trucking Co.,* 114 R.I. 146, 148, 330 A.2d 74, 76 (1975); *Gilbert v. Girard,* 109 R.I. 68, 71, 279 A.2d 919, 921–22 (1971). "Such testimony is admissible because the failure to object to its admission is deemed a waiver of its incompetency." *Burns,* 121 R.I. at 349, 398 A.2d at 1128 (citing *United States v. Lutz,* 142 F.2d 985, 988–89 (3rd Cir.1944); *Gilbert,* 109 R.I. at 71, 279 A.2d at 921–22). *See also* 1 *McCormick on Evidence* § 52 (5th ed. Strong 1999).

Furthermore, even if the challenged statements had been properly objected to, the plaintiff has failed to show how he was materially prejudiced by their admission. "[T]he admission of evidence rests in the sound discretion of the trial justice and will not be disturbed absent a showing of an abuse of that discretion." *Graff v. Motta*, 748 A.2d 249, 252 (R.I. 2000) (quoting *New Hampshire Insurance Co. v. Rouselle*, 732 A.2d 111, 113 (R.I. 1999) (per curiam)). An aggrieved party challenging the ruling of the trial justice additionally bears the supplemental burden of establishing that the questioned evidence was material and that its admission had an impermissible prejudicial influence on the decision of the factfinder. *Graff*, 748 A.2d at 252; *Caranci v. Howard*, 708 A.2d 1321, 1325 (R.I.1998). Concerning the three challenged hearsay statements here on appeal, the plaintiff has failed to demonstrate that the evidence contained in those statements was so singularly material and that its admission impermissibly prejudiced the fact-finder. Indeed, we find in the record more than substantial other similar evidence to support the trial justice's findings of a relationship of "trust, confidence and great intimacy" between Kevin and Ruth, that Kevin's adoption was ill-conceived, and that Kevin had otherwise "unduly influenced" Harle and Donald.[18]

The plaintiff also asserts that the trial justice improperly admitted the witness statement given by Malkovich to the Newport police department because the letter constituted "improperly admitted hearsay evidence." Yet, at trial, plaintiff's counsel objected only to its introduction as a full exhibit apparently on relevancy grounds, not on hearsay grounds. The following exchange occurred between each party's counsel and the trial justice:

"Q: Let me show you what's been marked Exhibit O, for identification, and ask you if that's a copy of your statement?

"A: This is my letter to the detective.

"Mr. Currier: With the permission of the Court, I ask he read that statement into the record?

"The Court: Let's save some time and put it in as an exhibit, and just indicate roughly what he said.

"Mr. D'Addario: I object to it as a full exhibit; makes conclusions about his opinion of the plaintiff. Totally inappropriate."

Thus, we agree with the defendants that the plaintiff is precluded now, on appeal, from challenging for the first time the validity of the introduction of the letter on hearsay grounds. *See Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 640 A.2d 950, 959 (R.I.1994) ("[i]t is well settled that a party may not 'advance new theories or raise new issues in order to secure a reversal of the lower court's determination'") (quoting *Nedder v. Rhode Island Hospital Trust National Bank*, 459 A.2d 960, 963 (R.I.1983)). Accordingly, we discern no error on the part of the trial justice when admitting the challenged tes-

---

18. The plaintiff asserts in his brief that these statements prejudiced Kevin because the trial justice relied on them in determining the existence of a romantic relationship between Ruth and Kevin, in determining that the adoption was a mistake, and in determining that Kevin engaged in misconduct concerning the loss of Ruth's will. We note that the trial justice did not conclude that Kevin "had a romantic relationship with Ruth Tinney," as alleged by the plaintiff in his brief. Rather, the trial justice concluded only that the testimony established that Ruth "*may* have had a sexual relationship with Kevin at one time * * *." He went on to conclude, "[n]onetheless, the Court believes that the relationship between Ruth and Kevin was one of trust, confidence, and great intimacy."

timony and Malkovich's statement to the Newport police.

## III

### Pleading

 The plaintiff next contends that the trial justice erred when it *"sua sponte* rendered judgment on a claim not pleaded by the defendants." The plaintiff maintains that the trial justice improperly granted affirmative relief to the defendants when he set aside the April 1991 and April 1997 conveyances of a proprietary interest in parcel one of Belcourt to Kevin when he only had before him the defendants' affirmative defense of "undue influence." More specifically, the plaintiff contends:

> "The trial court had two choices, to treat the defense as a defense without granting affirmative relief or to treat the defense like a counterclaim after providing notice to the parties of its intent to do [*sic*]. The problem arose here primarily because the trial court never indicated that it would treat the defense as a separate claim for relief. It sua sponte granted relief when no claim requesting relief existed. Plaintiff never suspected, nor should he have, that the trial court would invalidate the deeds from the Tinneys to Kevin Tinney, order Kevin to sell his portion of land owned with Donald and Harle Tinney, or order Kevin to vacate his home based on Defendants' defense."

Accordingly, the plaintiff contends that the trial justice acted *sua sponte* after the close of the evidence in granting affirmative relief that was not specifically requested by the parties.[19] We view the record quite differently.

In this case, the defendants pled "undue influence" as an affirmative defense, and they specifically requested affirmative relief in asking that Kevin's interest in the deeds be voided. Under this circumstance, although we might agree with the plaintiff's basic premise that the defendants' claim of undue influence should have been properly pled as a counterclaim and not as an affirmative defense, the trial proceeded with the understanding of all parties that the Tinneys were seeking to have not only the 1991 deed voided but also the 1997 deed to the separate lot.

Rule 8(c) of the Superior Court Rules of Civil Procedure gives the trial justice the discretion to treat an "affirmative defense" as a counterclaim. Rule 8(c) provides in pertinent part, "When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleadings as if there had been a proper designation." *See also Visconti & Boren Ltd. v. Bess Eaton Donut Flour Co.,* 712 A.2d 871, 873 (R.I.1998) (per curiam); *Hawkins v. Town of Foster,* 708 A.2d 178, 184 n. 1 (R.I.1998).

In *Hawkins,* 708 A.2d at 180, a trial justice precluded the Town of Foster (town) from presenting evidence as to campground operators' (campground) violations of applicable ordinances, which the town had raised as affirmative defenses to the campground's complaint to void these ordinances as *ultra vires.* On appeal, we noted, citing Rule 8(c), that the trial justice should have treated the town's affirmative defenses as counterclaims. *See Hawkins,* 708 A.2d at 184 n. 1. We reasoned that although the town labeled these allegations as "affirmative defenses" as opposed to "counterclaims," the record revealed that

---

**19.** The plaintiff complains, *inter alia,* that he was "ambushed," taken by "surprise," and that the trial justice "pulled an unforeseen rabbit out of a hat" and that the "parties believed" that the issue of undue influence only represented a "mere defense."

the town had "struggled valiantly" to have all of these issues fully considered at the trial. *See id.*

In this case, the trial justice properly treated the defendants' affirmative defense of "undue influence" as a counterclaim. *See Visconti & Boren Ltd.,* 712 A.2d at 873; *Hawkins,* 708 A.2d at 184 n. 1. The plaintiff's contention that he was "ambushed" by the trial justice, and that the trial justice pulled an "unforeseen rabbit" out of his hat, and that the plaintiff "never suspected, nor should he have, that the trial court would invalidate the deeds" is flatly contradicted by the record. The defendants' second amended answer, which the plaintiff did not object to, unequivocally asserted that the "[d]efendants allege that the *deeds* referred to in Plaintiff's Complaint were procured by Plaintiff through undue influence and/or duress and/or fraud." (Emphasis added.) It explicitly demanded that the "Plaintiff's complaint be dismissed, [and] that the *deeds* referred to in Plaintiff's Complaint be declared null and void, canceled and/or set aside." (Emphasis added.)

Indeed, at trial, the defense from the outset put Kevin on notice that it was seeking to establish his "undue influence" upon Ruth when Kevin, who was the first trial witness, was cross-examined about his actions and relationship with Ruth. The plaintiff was certainly aware of this claim and its potential consequences throughout the trial. In fact, his attorney interrogated Manning, the Tinney family attorney, as well as Harle, concerning whether the deeds in question had been freely executed, and Kevin was actually recalled to testify about the details of his relationship with Ruth. The trial justice, on more than one occasion throughout the trial, clearly indicated to the parties that the validity of Kevin's possessory interest in Belcourt was at issue.[20]

In a post-trial memorandum, submitted to the trial justice before the trial justice's decision was entered, the plaintiff specifically recognized that the deeds were being challenged and could be voided. He argued that:

"There is no question that the Plaintiff is a lawful co-owner of the real estate that he seeks to partition. Defendants' claim that the Plaintiff exerted undue influence or coercion in connection with the deeds to the real estate is without merit. In order to void the various deeds establishing his ownership on the ground of undue influence or coercion, the Defendants must establish, by a fair preponderance of the evidence, that the

20. The first such occasion took place on the defense's cross-examination of Kevin, when the trial justice and plaintiff's counsel engaged in the following exchange:

"Q: You used to take her on overnight trips after Harold died and before you got your name on the deed, didn't you, sir?
"A: Before and after, yes.
"Q: And you used to dance with her?
"A: Oh, yes.
"Q: And you used to take her horseback riding?
"A: Yes.
"Q: And you used to hug and kiss her in public?
 "Mr. D'Addario: Your honor, I'm going to object to this line. I want to be heard

for one second. The latest deed that Mr. Tinney is on isn't signed by Ruth Tinney. There's a deed in the file signed by the defendants and Mr. Tinney.
"The Court: Yes. But, you see, I just allowed an amendment to the complaint on undue influence. And, we're not in a vacuum here. If Mr. Currier is going to prove his clients' case, along with Mr. Kyle, I think they've got to be allowed to start somewhere. And at some point, at least allegedly or its uncontroverted, Mr. Tinney had a relationship with Mrs. Tinney, the late Mrs. Tinney, and also was the recipient of her beneficence [*sic*], as well as his adoptive brother and sister-in-law."

actions of the Plaintiff resulted in the substitution of his will for that of the grantors."

In this case, the record demonstrates that Kevin was at all times clearly on notice that the Tinneys were seeking to void his title interest in the applicable deeds. Kevin's contention now that the trial justice *sua sponte* "surprised" him is without merit.

## IV

### Right to a Jury Trial

 The plaintiff next asserts that the trial justice's "sua sponte treatment of the undue influence defense as a counterclaim without notice to plaintiff denied plaintiff his right to a jury trial on the counterclaim." Apparently, Kevin contends that if he had been given notice that the trial justice was being requested to grant the Tinneys affirmative relief, namely setting aside the deeds from the Tinneys to Kevin, then he would have asserted his right to a jury trial. Since we have determined that the trial justice acted appropriately in treating the "affirmative defense" as a counterclaim and that Kevin had been given more than adequate notice that the Tinneys were attempting to set aside Kevin's deeds, we need not determine what might have followed had Kevin ever claimed a jury trial because he never did and we will not speculate as to what would have taken place had he done so. In this case, it was only the Tinneys who in defending against Kevin's suit for partition had demanded a jury trial. That demand for a jury trial, however, was a complete nullity because a complaint for partition under G.L.1956 chapter 15 of title 34 is an equitable proceeding and does not permit trial by jury as a matter of right. *Duffy v.*

*Maciag,* 431 A.2d 1233, 1234 n. 3 (R.I. 1981). We also conclude from the record that both parties apparently agreed that the trial would be held without a jury during the pretrial conference with the trial justice. Accordingly, we need not reach the question of whether the parties properly waived their right to jury trial under Rule 39 of the Superior Court Rules of Civil Procedure because neither had at any time before commencing trial ever properly requested a trial by jury on any issue raised in their respective pleadings. *See Hall v. Pryor,* 108 R.I. 711, 713–15, 279 A.2d 435, 436–37 (1971) (reaching substantive question of whether defendant's right to jury trial was violated only after trial justice proceeded to hear the case, over defendant's timely objection, as a nonjury trial). Indeed, Kevin's trial counsel at the very beginning of trial assented to the nonjury trial in open court.[21] Under our long-standing raise or waive rule, the plaintiff has not adequately preserved this issue for review. Accordingly, we conclude that the trial justice committed no error in hearing Kevin's partition complaint while sitting without a jury.

## V

### Undue Influence

The plaintiff finally contends that the trial justice "misapplied the law of undue influence and made clearly erroneous findings by overlooking material evidence" when he found "undue influence absent evidence that the Tinneys failed to act upon their own free will or that they lacked the mental capacity."

 "Undue influence" is defined as the "substitution of the will of [the

---

21. The plaintiff's counsel stated at the beginning of trial, "I'll waive an opening statement. Since this is a *nonjury* trial, I think the Court is familiar with the general issues." (Emphasis added.)

dominant] party for the free will and choice [of the subservient party]." *Caranci v. Howard,* 708 A.2d 1321, 1324 (R.I. 1998). Exactly what constitutes undue influence is a question depending upon the facts of each particular case. *See* 25 Am. Jur.2d *Duress and Undue Influence* § 31 (1996). "Specific undue influence cases tend to be lonely islands of facts in an ocean of law; what constitutes undue influence in one case will not necessarily constitute undue influence in a similar case." *Id.* at 545. "Undue influence has been referred to as a species of constructive fraud which the courts will not undertake to define by any fixed principles lest the very definition itself should furnish a guide to the path by which its consequences may be evaded." 23 Am.Jur.2d *Deeds (Undue Influence)* § 203 (1983). In determining what constitutes undue influence in a particular case, then, a trial justice ordinarily examines the totality of circumstances, including the relationship between the parties, the physical and mental condition of the grantor, the opportunity and disposition of a person wielding influence, and his or her acts and declarations. *See* 23 Am. Jur.2d *Deeds (Undue Influence)* § 203; 25 Am.Jur.2d *Duress and Undue Influence* § 31.

The plaintiff advances several rather amorphous contentions that the trial justice misapplied the "law" of "undue influence." He contends that this Court has not discerned "undue influence" in cases when the donor or testator had sought the "advice of a personal attorney before executing the deed or will in favor of the donee." The plaintiff further contends that the trial justice erred in failing to apply two cases in which undue influence was not found with "facts substantially similar to the facts of this case." The plaintiff also chides the trial justice for relying on two particular cases, *Gilbert v. Marquis,* 61 R.I. 302, 200 A. 959 (1938), and *Huebel v. Baldwin,* 45 R.I. 40, 119 A. 639 (1923), to support his finding that Kevin unduly influenced the Tinneys.[22] In an exhaustive litany of alleged errors, he finally and generally contends that there was no factual question raised about the soundness of Ruth's mind—that any "influence gained by kindness and affection" does not suffice to undo a gift or deed— that Ruth had a strong will not easily overcome, and that the Tinney family wanted Kevin to have an interest in Belcourt because of his dedication to Belcourt. His initial attempt to convince the trial justice of those very contentions failed to impress the trial justice and fails to impress us.

■ We note first that this Court does not adhere, nor does it choose to adopt, a *per se* rule that merely because the personal attorney of the donor provides some testimony as to circumstances evincing a donor's free will in executing deeds that this testimony is enough by itself to defeat a claim or defense of undue influence. Rather, it is but one of many factors that the trial justice must weigh in considering all the evidence contained in the trial record. *See also* 23 Am.Jur.2d *Deeds* § 203. In this case, we are satisfied from the trial record that the trial justice properly con-

22. The plaintiff alleges in his brief that, unlike the donor in *Gilbert v. Marquis,* 61 R.I. 302, 200 A. 959 (1938) who was found to have been unduly influenced by a handyman, Ruth had all of her mental capabilities at the time she deeded an interest in Belcourt to Kevin, was not isolated from family and friends, and Ruth obtained the advice of her long-time attorney, not "some attorney shyster hired by Kevin." The plaintiff also alleges that in *Huebel v. Baldwin,* 45 R.I. 40, 119 A. 639 (1923), this Court "did not find, as suggested by the trial court, that the intimate relationship between the widow Muenchinger and the younger Mr. Baldwin constituted undue influence."

sidered all of the evidence before him and not solely the testimony of the Tinney personal attorney. *See also Kerr v. McKenna*, 57 R.I. 252, 255–57, 189 A. 408, 409–10 (1937); *Briggs v. Briggs*, 92 A. 571, 572–74 (R.I.1914).

The plaintiff's remaining averments in his litany of alleged error we deem to be without merit and without need for discussion. We determine that the trial justice did not, as alleged by Kevin, overlook cases previously decided by this Court that were substantially similar to this one in reaching his conclusion that Kevin unduly influenced the Tinneys.[23]

■ Finally, the plaintiff contends that the trial justice made erroneous findings by overlooking material evidence. More specifically, he argues that the trial evidence does not support the trial justice's finding that Kevin unduly influenced the Tinneys into executing the April 1991 deed.[24] We view the record quite differently.

According to our well-settled rule, this Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties. *See L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202, 206–07 (R.I.1997); *Harris v. Town of Lincoln*, 668 A.2d 321, 326 (R.I.1995). "More significantly, in relation to the case at bar, the same principle applies to the inferences and conclusions drawn by a trial justice in respect to ultimate issues of fact derived from the testimony and evidence. * * * Consequently, the inferences and conclusions drawn by the trial justice from the facts adduced at the hearing before [him] are entitled to substantial deference from this Court."

---

**23.** The two cases that plaintiff alleges were substantially similar to the present one, but which the trial justice did not address, are *Kerr v. McKenna*, 57 R.I. 252, 189 A. 408 (1937), and *Briggs v. Briggs*, 92 A. 571 (1914). However, the cases differ markedly from the one at hand. In *Briggs*, this Court stated that "No witness has related a single incident tending to show that he was in any way under the control or domination of his wife, or of any other person; there is no evidence that any of his acts were not solely the result of his own volition, and no one has asserted or suggested anything as affording a reasonable basis for finding the existence of the control of his will by that of another." *Id.*, at 574. In this case, ample evidence supported the finding that Kevin attempted and did unduly influence all the Tinneys, particularly Ruth. Similarly, in *Kerr*, this Court discerned no "undue influence" only after noting that:

"[T]he testimony is all to the effect that her mind remained clear and active to the end. She was described by witnesses for the complainants, as well as for the respondent, as a woman of strong mind, and not easily influenced against her will. There was no testimony indicating or tending to prove that she suffered any mental deterioration as a result of her long illness.
* * *
"The uncontradicted testimony is, however, that she was then as mentally alert and well as ever." *Kerr*, 57 R.I. at 253–54, 189 A. at 408–09.
Here, again, there was plentiful evidence on the record for the trial justice to conclude that the Tinneys, particularly, Ruth, were extremely vulnerable to being unduly influenced by Kevin.

**24.** The plaintiff apparently concedes that there was sufficient evidence to support the finding that Kevin directly influenced Donald and Harle to sign the April 1997 deed by threatening them with legal action. We agree with the trial justice, who found that Kevin threatened the Tinneys with various insidious allegations if they did not execute the April 1997 deed: "court action against the Tinneys; the reopening of Ruth's estate; jail for Harle's alleged illegal activities; having a group of investors take over Belcourt; and reporting to the police that Harle had killed Ruth by turning off her oxygen in the hospital."

*Dickinson v. Killheffer,* 497 A.2d 307, 312–13 (R.I.1985).

We discern in the trial record before us strong and compelling evidence demonstrating that Kevin's actions toward Ruth went well beyond acts of mere "kindness" or "consideration" in connection with securing a possessory interest in Belcourt via the April 1991 deed. Various witnesses testified that before her husband died, Ruth was "imperious" and "demanding," and evinced a strong will. Nevertheless, after Harold's death, Ruth was devastated, and became lonely and depressed. In the short time, thereafter, leading up to the time of Kevin's adoption and his addition to the Belcourt Castle deed, Kevin "solicited," "doted," and attempted to "ingratiate" himself with Ruth. He called her "mom" continuously, held her, kissed her, took her on overnight trips, and, after incessantly courting her, threatened to leave if he were not adopted by the Tinneys. He also, according to witnesses whom the trial justice found to be credible, asked Ruth to marry him. In addition, the trial justice had before him evidence of Kevin's covetous and avaricious motivations and of his dream of owning Belcourt, and that Kevin's behavior changed dramatically the instant he gained an interest in Belcourt.[25]

The trial justice we believe properly evaluated the testimony of Harle and Malkovich, who both testified to what the trial justice concluded to be Kevin's insidious motives and actions in influencing the Tinneys. He also properly discounted the testimony of Kevin, whose testimony he found to be generally not credible and at times incredible.

We discern nothing in the record that persuades us to conclude that the trial justice erred in finding that the material evidence produced by the Tinneys clearly exceeded the required burden of proof to show that Kevin unduly influenced Ruth into transferring him an interest in Belcourt. Accordingly, the plaintiff's allegations that the trial justice only reversed a business deal that went sour or that Ruth acted voluntarily out of a desire to compensate Kevin who had given so much to the Tinney family was controverted by the record. The plaintiff attempts to undo this finding by contending that, even if the trial justice properly found that Ruth was unduly influenced, the record is "devoid" of any evidence that Kevin unduly influenced Donald or Harle and that the trial justice found only that Kevin influenced Ruth, who in turn influenced Donald and Harle. Accordingly, the plaintiff argues that the law does not permit courts to void a transfer of property by imputing the influence of one person to another person. We are not persuaded by this argument. The trial justice found that the "facts and inferences taken as a whole indicate to this Court clear and convincing evidence of the exertion of undue influence by Kevin upon Ruth and the Tinneys." The evidence clearly established that Donald was anemic, depressed, and suffering from alcoholism in the time leading up to the signing of the deed. The trial justice found him to have been "emotionally and physically unstable." The trial justice also found that Harle was treated like a servant by Ruth, and thus was in a vulnerable position when she signed the deed. Accordingly, the trial justice did not err in finding that Kevin

25. The plaintiff in his brief contends that "none of this [evidence] matters" since the Tinneys conveyed an interest in Belcourt to Kevin out of their "own free will and volition." However, how Kevin acted toward the Tinneys in the time leading up to the transfer and his behavior immediately after gaining an interest is extremely probative of his motivations, credibility, and even the extent of control he exerted over the Tinneys.

unduly influenced all of the Tinney family, not just Ruth.

## VI

### Conclusion

For the reasons herein above set out, the plaintiff's appeal is denied. The judgment of the Superior Court is affirmed and the papers are ordered to be returned to the Newport Superior Court.

Chief Justice WILLIAMS did not participate.