STEPHENS *v.* BONNER.

No. 8342. JANUARY 14, 1932.

*C. A. Giles, J. W. Warren, and W. M. Goodwin,* for plaintiff in error.

*Hammond & Kennedy* and *Frank W. Bell,* contra.

RUSSELL, C. J. This writ of error is based upon the result of an appeal from the court of ordinary. Mrs. Bonner filed for probate in the court of ordinary the will of her deceased husband, and Mrs. Stephens filed a caveat upon two grounds, one undue influence, and the other monomania. By consent of the parties no trial was had in the court of ordinary, the issue being by consent appealed to the superior court. It is recited in the bill of exceptions that the caveator admitted a prima facie case in favor of the propounder, and assumed the burden of proving that the paper sought to be propounded was not entitled to probate, because of undue influence exercised over the testator by the propounder, and furthermore on account of an aversion, prejudice, and bias which developed into monomania, whereby the will of Mrs. Julia Dunn Bonner was substituted for that of the testator himself. At the conclusion of

the testimony the court directed a verdict in favor of the propounder. The caveator made a motion for a new trial, which was overruled, and to that judgment exception was taken.

The only question presented by the record is whether there was sufficient evidence to require the court to submit the issues to a jury. Or in other words, would no jury have been authorized to find a different verdict from that directed by the court? "Where upon a review of all the evidence, with reasonable deductions therefrom, it is manifest that there is but one finding which can be legally supported, it is not reversible error to direct a verdict." This ruling is quoted in the brief of defendant in error from *Cleveland-Manning Piano Co.* v. *Stewart*, 15 *Ga. App.* 657 (84 S. E. 174), in which the writer had the honor to deliver the opinion in behalf of the Court of Appeals, and he still believes that the statement enunciated a sound principle. However, after a very painstaking examination of the brief of evidence in this case, considered in connection with the nature of the questions of law raised by the caveat, we have reached the conclusion that issues were presented in the trial under review which can not properly be determined by a court, and which should have been submitted to the jury. As suggested by counsel for defendant in error, a superabundance of immaterial testimony was drawn out in the examination of the caveatrix, whereby that which is material is bedimmed and beclouded. Furthermore the very skillful cross-examination by the very able and learned counsel for the propounder greatly extended the testimony of the caveatrix into immaterial recitals and into some opinionative and theoretical extravaganzas, and these are accentuated, no doubt, by the casual interruption of her narrative for the introduction, as a witness for the propounder, of the minister of the gospel who performed the second marriage ceremony of the testator. We do not doubt that this break in the continuity of the testimony of caveatrix was for a good reason which addressed itself to the sound discretion of the court, but the diversion from the testimony for the caveatrix to testimony for the propounder certainly elongated the record of the testimony so as to obscure from the view of this writer, on his first examination of the record, a number of facts submitted in evidence, which altogether changed his first impression of the case.

Undue influence in procuring a will may exist in many forms,

and it may be operated through diverse channels. The existence and effective power of undue influence is not always susceptible of direct proof. It may be proved by circumstantial evidence. The same may be said of a caveat based upon the ground of monomania. And yet it must be admitted that either undue influence or monomania, or the two acting conjointly, or either ancillary or contributing to the active power of the other, may paralyze testamentary capacity. Our courts have uniformly held that the existence and operation of both undue influence and monomania are questions of fact for the solution of a jury. Forces so subtle, so multiform, so variant in each case in which they may be disclosed, and in which the proof of their existence is so often dependent upon circumstances, present questions where the court should properly leave the solution of any doubts which may arise in most cases to the solution of "the doctors of doubt, the jury." Of course, if all the facts proved for the purpose of setting aside a will upon the ground of undue influence and monomania, or either, and all legitimate inferences that can reasonably be drawn from the circumstances which may properly be adduced by a caveator in support of his contentions, fail, as a matter of law, to support the caveat, the judge may direct a verdict for the will and in favor of the propounder. But even so, he does this at the peril of invading the prerogative of the jury, and the power should be exercised with great caution.

What appears from the evidence in this case? We have a testator. The testator has a wife. The testator has a child. This daughter of the testator is not the daughter of the widow. The will leaves to the widow of the testator an estate testified to be worth $75,000. It leaves to his daughter, as the only testimony of ordinary paternal affection, the sum of $25. It is in evidence absolutely uncontradicted that the testator married the mother of the caveatrix, and she was born in lawful wedlock; that her paternity, not only conclusively presumed by law from the foregoing, was acknowledged by the testator, and that even after his first wife procured a divorce from him he bestowed upon his little girl in her early childhood the fondest endearments of a father to a daughter; that he supplied her mother from time to time with money to be used for her support; that he educated her, and as she grew older frequently gave her sums of money in various amounts; that he advised the marriage of his daughter to Meadows, her first hus-

band; that after her marriage he considered that she had been mistreated by her husband and advised her to leave him, and she acted upon his advice. There is not a syllable in the record that indicates that during all of these years the daughter failed in the performance of such filial acts of affection, service, respect, or regard, so far as lay within her power. The propounder became the wife of the testator on June 4, 1923, and in a very few days thereafter the testator executed the will offered for probate. The caveatrix is now a woman 52 years of age. The propounder, the stepmother, is between 70 and 74. All these years she has known of the existence of the caveatrix. When it became necessary to probate the will in solemn form, it was required that the application state the heirs at law. She stated that she was the sole heir at law of the testator. And then, as if recovering from a lapse of memory, she stated that there was a Mrs. Stephens who claimed to be an heir at law. From these facts a jury would certainly have been authorized to find that the caveatrix is the lawful daughter of the testator, and as such would have been entitled under the rules of descent and inheritance to one half of the estate left by her father if no will had been made. Prima facie there would have been no reason why a will should have been made disinheriting her, except the claim of her stepmother that she was illegitimate—a bastard if the child of the testator, or not his child at all. This reference of the propounder in the application itself might be a significant circumstance as to the degree of tenderness, or the contrary, entertained by the stepmother and the state of her feelings toward this unwelcome child during the long years of her intimate acquaintance with the testator, before she married him after the death of her husband.

The Civil Code, § 3834, declares: "The very nature of a will requires that it should be freely and voluntarily executed; hence, anything which destroys this freedom of volition invalidates a will; such as fraudulent practices upon testator's fears, affections, or sympathies, duress or any undue influence, whereby the will of another is substituted for the wishes of the testator." We come now to consider what is necessary to prove undue influence. In *Penniston v. Kerrigan,* 159 *Ga.* 345 (125 S. E. 795), Mr. Justice Gilbert, delivering the unanimous opinion of the court, said: "When the trial on such an issue reaches the stage where evidence must be introduced to establish the allegations, we find that the rules of evi-

dence in such a case established by long practice in the courts have taken into account the peculiar circumstances surrounding the issue, and the allegations necessary to be proved. In Redfearn on Wills and Administration of Estates, § 48, it is said: 'A very wide range of testimony is permissible on the issue of undue influence. This is due to the fact that undue influence seldom can be shown except by circumstantial evidence. It results from the circumstances and surroundings of the testator and his associations with the person or persons exercising the undue influence. For this reason it is proper, on this issue, to consider the testator's dealings and associations with the beneficiaries; his habits, motives, feelings; his strength or weakness of character; his confidential, family, social, and business relations; the reasonableness or unreasonableness of the will; his mental and physical condition at the time the will was made; his manner and conduct; and generally every fact which will throw light on the issue raised by the charge of undue influence.' . . The second ground based on alleged undue influence also contained the other allegations hereinbefore stated. 'Is it a mere conclusion to allege that one of two daughters has represented to a father that the other daughter does not love the father? Love is and ever has been one of the most powerful motives that rule the human mind. In all history nothing has so wrung the parental heart with grief as the belief that a child is undutiful, unworthy, and unloving. Love has led to the greatest tragedies. It has destroyed cities and empires. In all ages in song and story love and unrequited love have been painted as the ruling passions of men and women. Next to love, perhaps, comes the desire for money, and the jealousies and suspicions that too often arise on the passing of a parent or ancestor whose worldly possessions are to be distributed among expectant heirs. We think that to allege in a caveat that one daughter has convinced a father that the other daughter does not love the father is to allege a fact and a most potent fact likely to influence the father in the execution of his will." Thereupon the judgment of the lower court was reversed for error in striking the ground of the caveat in which it was alleged that one of the daughters of the testator [Judge Joel Branham] had poisoned his mind against caveatrix by strongly arousing the fears and sympathies on the part of the testator, making wrongful and unjust charges against caveatrix, to the effect that

caveatrix had no love or affection for the testator and was undutiful and unworthy of his consideration, etc.

From the unreasonable disposition of the testator's estate, which under § 3841 of the Code "should have much weight in the decision of the question," we think a jury would have been authorized, with the aid of other circumstances which appear in the brief of evidence, and reasonable inferences drawn therefrom, to find that there was undue influence exerted by the propounder as charged in the caveat, which subverted the volition of the testator and substituted therefor the will of the propounder. It is in evidence that the testator, after the separation from his wife, carried propounder and her husband to his home, and she there remained until the death of Dunn, her former husband, and until her marriage with testator, the only female in the house, rendering, so far as appears from the record, all of the usual domestic duties of a housekeeper and caretaker for the testator while her husband was night-watchman of other real estate owned by the testator. That testator and Mrs. Dunn associated upon terms of the utmost confidence and familiarity, took long rides together, and were constant associates. No incontinence on the part of either is shown, but the very nature of the circumstances in their long years of association would authorize the inference that even a most estimable woman, in long years of continued daily contact, would acquire great influence with a solitary man who is shown not to have been of a jovial or social disposition and whose companionships were very few. *In Gaither* v. *Gaither*, 20 *Ga.* 709 (2), it was held that "A son, married but still young, gave a large legacy to the children of his father, and whilst the son and his wife were residing with the father. The wife attacked the will, alleging, amongst other things, that the will was procured by the father, and by the exercise of undue influence on the son: *Held*, that the relation of parent and child, and the residence of the son under the parent's roof, were facts to be taken into consideration by the jury, in determining the questions raised by the said allegations of the wife."

The second ground of the caveat was based upon the allegation that the testator, by reason of monomania, was incapable of making a will. § 3840 of the Code declares: "An insane person can not generally make a will. A lunatic may, during a lucid interval. A monomaniac may make a will, if the will is in no way the result

of or connected with that monomania. In all such cases it must appear that the testament does speak the wishes of the testator, unbiased by the mental disease with which he is affected." In *Dyar* v. *Dyar*, 161 *Ga.* 615 (131 S. E. 535), it was held that it was a sufficient allegation of monomania that testator had an insane delusion that his daughter who married "thereby made a choice between him and the man she married, and forever cut off any relationship with him and was no longer his daughter." Under the principle stated in that case, a jury would have been authorized to find that the testator was afflicted by a similar monomania. As already stated, the evidence shows that the testator had always recognized the caveatrix as his daughter, that she was in law his daughter, a child born in lawful wedlock, and that after having advised her to marry Meadows he later urged her to leave him. After this separation, advised by her father, her husband, by constant persuasions, induced her to return to him. She went to tell her father of this; whereupon he was completely maddened and outraged, and told her that "the back of his hand was against her from then on forever." In another part of her testimony she says: "My father and I had a difference about my going back to my first husband after our separation, and my father and I have had no communication except he nodded to me on the street. I have attempted to establish relationship with him, but have never been able to do so." Whether he brooded over the refusal of the caveatrix to obey his command to desert her husband, and whether or not, in the close association with Mrs. Dunn before the death of her husband and her marriage to him, he became obsessed with the idea that this woman who is really his daughter was not his child, is an issue of fact. Mrs. Bonner, the propounder, testified: "I do not recognize Mrs. Stephens as bearing any relationship to Mr. Bonner. Mr. Bonner told me she was not his." As said in *Dibble* v. *Currier*, 142 *Ga.* 859 (83 S. E. 949, Ann. Cas. 1916C, 1): "The allegations that the mind of the testatrix became unbalanced and incapable of reasoning with reference to her marriage and the events associated with or arising from it, that she became imbued with the hallucination that her heirs, who refused to comply with her insane desires, were not of her blood or family, were not related to her, and were not entitled to her affection or treatment as kinsmen, go beyond allegations of prejudice, passion, illogical reason-

ing, unfounded suspicion, or the like, and set up an actually diseased condition of the mind, and delusions arising therefrom—in other words, partial insanity or monomania." "A delusion such as will deprive one of testamentary capacity must be an insane delusion. An insane delusion was said by Sir John Nichol, in the celebrated case of Dew *v.* Clark, 3 Add. Ecc. 79, to exist wherever a person conceives something extravagant to exist which has no existence whatever, and he is incapable of being permanently reasoned out of that conception." *Bohler* v. *Hicks,* 120 *Ga.* 800, 804 (48 S. E. 306.)

*Judgment reversed. All the Justices concur, except*

BECK, P. J., dissenting. While I take no issue with the majority of the court as to the propositions of law laid down in this case, I do not concur in the conclusion reached that the court erred in directing a verdict; for I do not think that the jury would have been authorized to find, under all the evidence submitted, any other verdict than that which was directed.