DECISION
Before this Court is the petition of Antone Paiva, Robert Paiva Sr., Steven Paiva, and David Paiva (collectively "the Petitioners" or "the Brothers"), seeking to nullify a quitclaim deed and two wills executed by their mother, Catherine Paiva ("Mrs. Paiva") in favor of the Respondent, Brian Paiva ("Brian").[1] Petitioners contend that the instruments are invalid as they were created under Brian's undue influence. Petitioners further contend that Brian committed an abuse of process by seeking seven restraining orders against his family members with the alleged intent of alienating his mother from the family. Brian opposes all allegations as the beneficiary and executor of Mrs. Paiva's estate. Jurisdiction is pursuant to G.L. 1956 § 8-2-17.
 I Facts and Travel
This matter consists of three consolidated cases arising from a dispute between the Petitioners and Brian Paiva. The trial was heard on the 3rd, 4th, 5th, 6th, and 7th of March 2008, by this Court, sitting without a jury. The following is an overview of the facts in this case. These facts, in addition to the witness summary and credibility determinations infra, will constitute this Court's findings of fact pursuant to Super. R. Civ. P. 52(a). *Page 2 
Catherine Paiva was the beloved matriarch of her family. She had five sons: Antone, Robert, Steven, David, and Brian. In the early 1990s, Brian moved in with his mother, living rent-free in her home. The evidence indicated that Brian performed some work for Mrs. Paiva, but that she complained of his overdrawing her checking account. Around that time, Brian introduced his mother to his long-time friend, Eleanor "Queenie" Micelli ("Queenie"), who began to spend increasingly more time with Brian and Mrs. Paiva. In 1996, Mrs. Paiva executed a will (the "Original Will"), which named her eldest son, Antone, as executor and distributed her property — consisting of her land, house, insurance policies and Social Security benefits — per stirpes in equal shares among her five sons. In October 2004, Mrs. Paiva was treated at Miriam Hospital for adenocarcinoma, a type of cancer, which had metastasized to her spine. At that time, Mrs. Paiva appointed Brian to make health care decisions for her and to distribute her pain medications. In December 2004, Mrs. Paiva spoke to her nurse and several members of her family members regarding her fears and concerns about Brian's role in her care. According to the testimony of Mrs. Paiva's nurse, as well as that of her sister-in-law, Hilda Paiva Brasil, and her sons — Antone, Robert, and Steven, Mrs. Paiva feared Brian. She entrusted the Original Will and a life insurance policies to Antone in order to ensure their execution according to her wishes.
In April 2005, Mrs. Paiva celebrated her 83rd birthday with her family. The family members all testified consistently that there were no family problems at that point in time and that they enjoyed Mrs. Paiva's company. Steven testified that he and his children visited Mrs. Paiva frequently in April and that they often ran errands for her. On April 6, 2005, Brian and Queenie assisted Mrs. Paiva to Attorney Robert Calvino's office to execute a Power of Attorney granting Brian control over Mrs. Paiva's assets. Bringing the matter to Attorney Calvino had been Queenie's recommendation. It was after Brian obtained Power of Attorney that the family *Page 3 
began to see a change in Brian and Mrs. Paiva. On April 21, 2005, Brian and Queenie took Mrs. Paiva to Attorney Frank Lombardi, who had been recommended by Robert Calvino, to prepare a new will. On May 2, 2005, Mrs. Paiva executed a will (the "Second Will") bequeathing half of her estate to Brian and Queenie, and leaving the other half to be divided among the Brothers. According to Brian, Mrs. Paiva instructed him not to tell his siblings about the new will. Soon after, Brian sought to sell Mrs. Paiva's property, which surprised and upset the Brothers, as they had always believed that Mrs. Paiva wished to pass away in her own home.
Throughout the spring and summer of 2005, the Paiva family faced a tumultuous time. A disagreement as to the method of payment for Mrs. Paiva's medications developed between Brian and David. This disagreement erupted into a shouting fight between David and Mrs. Paiva, after which Brian sought a restraining order to keep his brother away from his mother. Brian testified that David was disrespectful to their mother and that Brian had reason to be concerned for his mother's well-being. David testified that the disagreement never reached such a level. The restraining order Brian sought after this event was the first of seven. All of the restraining orders were issued to keep family members out of contact with Mrs. Paiva. In early June, Mrs. Paiva received a visit from her grandson's wife, Katrina Paiva ("Katrina"). During that visit, Mrs. Paiva confided in Katrina what Brian had told her about the Brothers trying to throw her out of her house and place her in a nursing home. Katrina testified that when she attempted to dispute this accusation, Brian commanded her to leave.
In mid-June, one of the grandsons, Tommy Paiva ("Tommy"), visited Mrs. Paiva in the morning, and returned in the afternoon to find that the doors were locked and the telephone number had been changed. While knocking to get in, Tommy broke a window pane. Brian called the Lincoln Police ("Police") to have him arrested for vandalism. When two of the *Page 4 
Brothers, Antone and Robert, arrived to help, they were instructed by the Police to stay away from the house. After this incident, Robert attempted to visit Mrs. Paiva to tell her of the Brothers' concern that Brian was alienating her from the family. Brian did not allow Robert to speak with Mrs. Paiva.
On June 14, 2005, Mrs. Paiva returned to Attorney Lombardi's office to execute yet another will (the "Third Will"), which eliminated the portion of the Second Will that bequeathed half of the estate in equal parts to the Brothers. Soon after, Brian exercised his Power of Attorney to assign Mrs. Paiva's life insurance policies (the "Insurance Policies") to her niece, Shannon Paiva Woodall, who lived in Texas but testified that she was a close confidant of Mrs. Paiva's in her ailing years. On June 15, 2005, the Brothers filed the first of the consolidated complaints in this case. The Brothers sought to prohibit Brian from interfering with or preventing each of them from having individual contact with their mother and sought to restrict Brian from selling Mrs. Paiva's real estate.
On July 19, 2005, Mrs. Paiva executed a quitclaim deed ("the Deed"), transferring her real property to Brian. The Deed was prepared by Attorney Erin Illuzzi, an associate of Attorney Lombardi. On July 27, 2005, Mrs. Paiva was hospitalized in critical condition from cancer. Mrs. Paiva's health, according to the testimony and written records of her treating doctors and nurses, declined rapidly over the course of the summer. One treating physician's notes indicated that in July, Mrs. Paiva was lucid and able to communicate clearly. However, by August 1, 2005, a visiting nurse's notes indicated that Mrs. Paiva was confused, lethargic, and hallucinating, but was able to speak in full word sentences. Similar reports indicating confusion, forgetfulness, and lethargy exist for August 5, 2005, as well as the 8th, 9th, 10th, 11th, and 12th of August 2005. *Page 5 
Mrs. Paiva passed away on August 14, 2005. Mrs. Paiva had intended that her Insurance Policies be used for her burial. Instead, Shannon cashed out the Insurance Policies (together totaling $5000), giving $1000 to Brian and keeping the remainder. The family unrest continued after Mrs. Paiva's death, as the Brothers disagreed with Brian and Shannon as to where Mrs. Paiva would wish to be buried. The Brothers sought to bury Mrs. Paiva next to her husband of 50 years. Brian, however, believed Mrs. Paiva preferred to be in a plot near the burial sites of her sister and her deceased infant child. Brian admitted in his testimony that he did not get along with his father. By a decision of the Superior Court, it was determined that the majority ruled, and Mrs. Paiva was buried next to her husband. Shannon and Brian did not attend the funeral or wake, and according to the testimony of a neighbor, they burned her personal records and memorabilia a few days later.
On September 27, 2005, a notice of lis pendens was filed with the Clerk's Office for the Town of Lincoln to prevent Brian from selling Mrs. Paiva's real estate. On September 29, 2005, the Brothers filed a second complaint in this Court requesting that the Deed be found null and void. On December 21, 2005, the Probate Court of the Town of Lincoln ordered that the Third Will be admitted for probate. In January 2006, the Brothers filed a third complaint, consolidating the unresolved matters in this case. The remaining allegations which were tried before this Court are as follows:
 1. The Brothers allege that the Second and Third Wills, filed in Lincoln Probate Court and executed by Mrs. Paiva, are null and void as a result of undue influence.[2] The Brothers request that *Page 6 
this Court find the Original Will, filed October 31, 1996, which names all children equal beneficiaries, to be the valid Will.
 2. The Brothers allege that the Deed made from Mrs. Paiva to Brian is invalid, and request a declaratory judgment pursuant to G.L. 1956 § 9-30-1, et seq. to that effect.
 3. The Brothers allege that Brian abused the process for obtaining Family Court restraining orders, and made false complaints to the Lincoln Police in order to prevent the Brothers from seeing their mother. The Brothers seek damages for their abuse of process claim.
In response to these allegations and the evidence brought in support of them, Brian asserts that his mother intended to favor him in the disposition of her property because he served as her sole caretaker in her ailing years.
This Court heard the testimony and examined the exhibits presented for both parties. The parties submitted proposed findings of fact, law, and judgment. The following are this Court's factual findings, which include some of those proposals by the parties with which the Court agrees.
 A Witnesses
The Court heard testimony of the following witnesses.
For the Petitioners: 1. Leo Nadeau, a friend of the family, who witnessed Brian Paiva and Shannon Paiva Woodall burning Mrs. Paiva's personal records and memorabilia, and celebrating her death a few days after her passing.
 2. Cheryl Carney, a licensed nurse and relative who listened to Catherine Paiva talk of her fear of Brian Paiva. According to Ms. Carney's testimony, Mrs. Paiva told her *Page 7 
that Brian wanted to sell the house to purchase a condominium, but she said, "I'm not selling, he's not taking my house off me." It was Ms. Carney's understanding the Mrs. Paiva was not fearful of her other sons.
 3. James Paiva, a returning Iraq veteran and Mrs. Paiva's grandson, with whom Brian shared his plans to obtain Mrs. Paiva's house before her death. He testified that Brian had put the home up for sale on the internet, but asked James not to share the information with his brothers or uncles.
 4. Katrina Paiva, the wife of one of Mrs. Paiva's grandsons, who was very close with her. Katrina testified that Mrs. Paiva told her of Brian's false statements about the Brothers seeking to put her in a nursing home.
 5. Gina Aroyan, a certified nursing assistant, who visited Mrs. Paiva in her final weeks. Ms. Aroyan testified that Mrs. Paiva felt her sons had "dragged" her to court over her house.
 6. Judith Assad, Esq., Mrs. Paiva's Guardian ad Litem in the summer of 2005, during the family dispute over where Mrs. Paiva should be buried. Attorney Assad met with both sides. She testified that Brian cared for Mrs. Paiva, and that the family dispute appeared to her to result from a culmination of issues.
 7. Hilda Paiva Brasil, Mrs. Paiva's 88-year-old sister-in-law. Mrs. Brasil testified that Mrs. Paiva discussed with her fears that she had about Brian. Mrs. Brasil further testified that Mrs. Paiva expressed a desire to treat all of five of her sons equally in her Will.
 8. Robert Paiva, Sr., the second oldest of Mrs. Paiva's sons, testified that while he visited his mother regularly, she said in Court (on a previous matter) that he never came around. He further testified that the Insurance Policies were intended to be used for Mrs. Paiva's burial and that she would never have given it away.
 9. Antone "Butch" Paiva, Mrs. Paiva's oldest son, and holder of her actual Original Will and Insurance Policies. He testified that his mother instructed him to keep the instruments away from Brian. Antone further testified that Mrs. Paiva never informed him that she was giving Brian Power of Attorney. He stated that when he saw her in June while Brian was present, she told Antone "I'm being forced to do things I don't want to do."
 10. Stephen Paiva, Catherine's son who lived in North Carolina. He testified that when he went to visit Mrs. Paiva, Brian locked him out of the house, changed the telephone numbers, and called the Lincoln Police to keep him away from the home. Stephen denied ever threatening Brian or his mother. *Page 8 
For the Defendant: 11. Frank Lombardi, Esq., who drafted the Second and Third Wills, and who represented Brian and Mrs. Paiva. Attorney Lombardi testified that he found Mrs. Paiva was lucid and competent to execute both wills. He was referred by an attorney who had done work for Queenie.
 12. Barbara Colucci, Mrs. Paiva's sister who had not visited her in 15 years and did not attend her wake. Ms. Colucci testified that Mrs. Paiva was disappointed with her sons over the last few years of her life.
 13. Erin Illuzzi, Esq., an attorney and associate of Frank Lombardi, who represented both Brian and Mrs. Paiva. Ms. Illuzi testified that she took information and instructions from Brian on six or seven occasions to prepare the Deed and Mrs. Paiva's affidavit. The affidavit was drafted while Mrs. Paiva was in the hospital and was used to obtain a restraining order in late July 2005. Attorney Illuzzi further testified that she had no belief that Mrs. Paiva was executing the instruments under duress or coercion, but she noted that Brian and Queenie were always present with Mrs. Paiva when she worked on these matters.
 14. Janina Zalewski, a certified visiting nurse, who befriended Brian Paiva. She testified that Brian cut her hair on several occasions and that he gave her a bottle of scotch as a gift. According to Ms. Zalewski's testimony, Mrs. Paiva was concerned that the Brothers wanted to put her in a nursing home and she was afraid of what the Brothers might do to Brian.
 15. Shannon Paiva Woodall, a granddaughter from Texas, who visited Catherine in June 2005. According to Shannon, Mrs. Paiva told her that she wanted the house to go to Brian. Shannon testified that she accepted the assignment of the Insurance Policies from Brian and cashed the policy upon Mrs. Paiva's death. Shannon also testified that she did not attend Mrs. Paiva's wake or pay for the burial from the proceeds of the Insurance Policies.
 16. Eleanor "Queenie" Micelli, a long-time friend of Brian Paiva, who had, in the presence of hospital personnel, referred to herself as Mrs. Paiva's "daughter." Queenie testified to a close relationship with Brian and Mrs. Paiva, and stated that she occasionally drove them on errands. She further testified that she located Attorney Robert Calvino to draft the Power of Attorney and that he then recommended Attorney Frank Lombardi to draw a will. She was present at all of the meetings with these attorneys. According to Queenie, Mrs. Paiva told her that she didn't want the Brothers to get anything, that the house should go to Brian, and that when she died, she did not wish to be buried near her late husband. 17. Brian Paiva, the youngest of Mrs. Paiva's sons, and an unemployed hairdresser. Brian lived with his mother rent-free from the early 1990s to her death in 2005. He *Page 9 
acted as her primary caretaker and secured control over her affairs by obtaining her Power of Attorney. He changed her phone number and locked her doors to keep his siblings away. He testified that he did not get along with his father, but that there had been peace between the siblings until the final months of Mrs. Paiva's life. Brian testified that the restraining orders he sought were the direct result of what he believed was his family's harassment of his mother.
 B Additional Findings of Fact and CredibilityDeterminations
This Court incorporates the summary of facts and the witness list above and additionally finds the following:
(1) This Court finds that the Original Will was valid at the time of its execution.
(2) This Court finds persuasive the testimony of the siblings that their relationship with their mother began to deteriorate after April 2005, and after Brian held Power of Attorney and acted has Mrs. Paiva's primary caretaker.
(3) This Court accepts the testimony that Mrs. Paiva feared Brian, and that she sought, at least for a time, to protect her assets from him.
(4) While the Court gives some credence to Brian's testimony that he felt he was the only one caring for his mother, the Court generally does not find him credible. Other siblings attempted to aid in this care, and Brian refused to allow the help. It was clear to this Court that Brian's testimony was driven by self-interest and a desire for financial gain.
(5) Brian's actions in requesting other relatives to leave or locking them out indicate that he sought to eliminate contact between his mother and the rest of his family. The Court is not persuaded that Brian had reason to believe these relationships were damaging to Mrs. Paiva. *Page 10 
(6) This Court is persuaded of the significant effect that Brian's constant suggestions of his siblings' failures could have upon his mother[3] and finds that Brian made these suggestions with the intent to alienate his siblings and isolate his mother in order to further his control over her financial assets.
(7) Although the Court accepts the testimonies of Attorney Lombardi and Attorney Illuzzi that Mrs. Paiva was competent to execute the Deed and her Second and Third Wills, the Court does not find that this fact eliminates the possibility of undue influence.
(8) The Court finds that Mrs. Paiva's health deteriorated rapidly in the final months of her life, making her more susceptible to influence by her caretaker. In addition to the effects of Mrs. Paiva's failing health, she was also prescribed powerful medications, including Oxycontin and Morphine, to control pain. These medications increasingly altered her level of alertness and cognitive functioning, and, as a result, she became more dependent upon Brian for her care and comfort.
(9) The Court finds that the relationship with Queenie renders the testamentary gifts suspicious. The Court finds that Queenie was motivated by financial gain and that her testimony was altogether incredible.
(10) The Court further finds that Brian and Queenie's involvement in securing the later wills shows intent to influence Mrs. Paiva's decision. The first attorney with whom Mrs. Paiva met was, in fact, recommended by Queenie.
(11) Brian's assignment of the Insurance Policies to Shannon and her later return to him of $1000 show a goal of lucrative gain on both of their parts and demonstrate their failure to *Page 11 
follow the expressed wishes of Mrs. Paiva. The Court finds Shannon's testimony incredible and driven by self interest.
(12) The Court finds that Brian and Shannon failed to attend the funeral and destroyed Mrs. Paiva's records and mementos. These actions demonstrate not only the family estrangement, but also Brian and Shannon's disingenuousness.
(13) Finally, the Court finds that Brian used his special position as sole caretaker and holder of Power of Attorney to influence Mrs. Paiva and to secure financial benefits.
 II Standard of Review
The Rhode Island General Laws provide that "[a]ny person aggrieved by an order or decree of a probate court . . . may, unless provisions be made to the contrary, appeal to the superior court." G.L. 1956 §33-23-1(a). In hearing probate appeals, "the Superior Court is not a court of review of assigned errors of the probate judge, but is rather a court for retrial of the case de novo." In re Estate of Paroda,845 A.2d 1012, 1017 (R.I. 2004); Section 33-23-1(d).
In a non-jury trial, the standard of review is governed by Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure. The Rule provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." Accordingly, "the trial justice sits as a trier of fact as well as of law." Hood v. Hawkins, 478 A.2d 181,184 (R.I. 1984). In a non-jury trial, "determining the credibility of [the] witnesses is peculiarly the function of the trial justice."McEntee v. Davis, 861 A.2d 459, 464 (R.I. 2004) (quoting Bogosian v.Bederman, 823 A.2d 1117, 1120 (R.I. 2003)). This is so because it is "the judicial officer who [actually observes] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness *Page 12 
demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of the Dissolution ofAnderson, Zangari Bossian, 888 A.2d 973, 975 (R.I. 2006).
Although the trial justice is required to make specific findings of fact and conclusions of law, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues."White v. Le Clerc, 468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. 52(a). It is well settled that "the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong."Greensleeves, Inc. v. Smiley, 2007 R.I. LEXIS 127 (R.I. 2007).
 III Analysis
The legal issues before the Court are whether Mrs. Paiva's Deed and her Second and Third Wills were the product of undue influence and, therefore, invalid; and whether Petitioners have proven that Brian committed an abuse of process by seeking restraining orders to prevent his family members from contacting Mrs. Paiva.[4]
 A Undue Influence
"Undue influence long has been recognized in equity as a defense to or a means of challenging the validity of a will, deed, or contract. . . . In such cases, equity provides an action for restitution or rescission to cure the dominant party's wrongful `substitution of [his or her *Page 13 
will] for the free will and choice [of the subservient party].'"Lavoie v. N.E. Knitting, Inc., 918 2d 225, 229 (R.I. 2007) (citingFilippi v. Filippi, 818 A.2d 608, 630 (R.I. 2003); Tinney v.Tinney, 770 A.2d 420, 435 (R.I. 2001); Caranci v. Howard, 708 A.2d 1321,1322 (R.I. 1998)).
In determining whether an instrument is the product of undue influence, the Rhode Island Supreme Court has found that the trial justice must consider the totality of the circumstances, as the action is "constructive fraud which the courts will not undertake to define by any fixed set of principles lest the very definition itself should furnish a guide to the path by which its consequences may be evaded."Tinney, 770 A.2d at 438 (quoting 23 Am. Jur. 2d. Deeds (UndueInfluence) § 203 (1983)). Although there is, by design, no road map for the trial justice to follow, there are a number of factors that the Court may consider as giving rise to an inference of undue influence.Caranci, 708 A.2d at 1324. These factors include (1) the existence of a fiduciary relationship or a relationship of trust and confidence; (2) the opportunity to exert influence; (3) the disposition, acts, and declarations of the person allegedly exerting influence; (4) susceptibility of the testator to influence, such as failing physical or mental condition; and (5) unnatural disposition of the will. Seeid.; see also Notarantonio v. Notarantonio, 941 A.2d 138, 147 (R.I. 2008) (citing Filippi, 818 A.2d at 630; Tinney, 770 A.2d at 438, finding that "a trial justice ordinarily examines the totality of the circumstances, including the relationship between the parties, the physical and mental condition of the grantor, the opportunity and disposition of a person wielding influence, and his or her acts and declarations").
While undue influence provides an action in equity for both deeds and wills, the standards for establishing undue influence differ based upon the instrument. 25 Am. Jur. 2d Duress and Undue Influence § 47 (2006) (stating that the majority rule provides that a "lower *Page 14 
standard of proof of undue influence is required for wills and a higher one for contracts. . . ."). This Court will therefore address each instrument separately.
 1 The Deed
The general standard for determining undue influence with respect to deeds is established in Tinney v. Tinney, 770 A.2d 420 (R.I. 2001). There, the Rhode Island Supreme Court upheld the trial court's finding of undue influence when a wealthy, aging widow conveyed a significant portion of her estate to a handyman who had ingratiated himself to her and upon whom she had become dependent. Id. at 430-431, 439-440. InTinney, the Court applied the heightened "clear and convincing" standard of proof and required that those challenging the conveyance meet this standard to invalidate the deed. Id. at 440.
The general standard laid out in Tinney is altered, however, when the beneficiary of the deed enjoys a relationship of trust and confidence with the grantor. Passarelli v. Passarelli, 94 R.I. 157, 159-160,179 A.2d 330, 332 (1962). The Petitioners contend that determining the validity of the Deed in the instant matter requires analysis of this case under the Passarelli standard. Id. at 179. As in the instant matter, Passarelli involved a deed transferring a mother's property to her child. The mother in Passarelli later sought to cancel that transaction as a product of undue influence. The Court inPassarelli found that "[o]rdinarily, one who seeks the cancellation of an instrument bears the burden of establishing his right thereto by clear and convincing evidence. . . . However, where a relationship of trust and confidence exists between grantor and grantee, it is generally held that the burden is on the grantee to establish [by clear and convincing evidence] that the transfer was the deliberate and voluntary act of the grantor and that the transaction was fair, proper, and reasonable in all circumstances." Id. at 159-160. The rationale for this standard stems from the long-held rule that when a beneficiary of another's *Page 15 
property played a role of trust and confidence in the disposition, then "[t]he circumstances are suspicious and . . . [call] for some explanation." Kerr v. McKenna, 57 R.I. 252, 255, 189 A. 408, 409 (1937).
The Passarelli standard, which shifts the burden of proof onto the grantee, applies to deeds only where there is a relationship of trust and confidence between the grantor and the beneficiary. Therefore, this Court must first determine whether such a relationship existed in this case. In Passarelli, the Court concluded that there must be more to the relationship of trust than a mere parent-child relationship, but that where property is conveyed in consideration of a promise of maintenance and support by the child, then the relationship may reach the fiduciary level and this burden-shifting standard would apply. SeePassarelli, 94 R.I. at 160-161, 179 A.2d at 332.
In the instant matter, Brian claims that because he did not use his mother's Power of Attorney in signing the Deed, the non-fiduciary standard applies, and the challengers of the instrument must prove their right by clear and convincing evidence. This Court is not persuaded by Brian's distinction. The language in Passarelli indicates that there need only be "an implicit trust relationship" or a "relationship between the parties that was fiduciary in nature." Id. at 160, 162. Therefore, the existence of such a relationship is sufficient to raise the inference of possible undue influence, and such an inference may arise even when the beneficiary does not have the power to actually execute the deed. This interpretation is akin to and supported by the Supreme Court's finding that a donor's use of a personal attorney to draft the instrument, while "evincing a donor's free will in executing deeds," is not sufficient to defeat a claim of undue influence. Tinney,770 A.2d at 438 (independence in executing the instrument is generally insufficient to defeat an inference of undue influence). Therefore, the Petitioners here must only establish that a trust relationship existed in general; it is unnecessary for the Petitioners to prove *Page 16 
that Brian used his fiduciary position to execute the Deed. This Court finds that because a clear fiduciary relationship existed as a result of the Power of Attorney, that relationship set this case squarely within the Passarelli burden-shifting standard. See Passarelli,94 R.I. at 160-161, 179 A.2d at 332. Therefore, with respect to the Deed, Brian bears the burden of proving by clear and convincing evidence that the transfer was deliberate and voluntary, and that it was fair, proper, and reasonable. See Tinney, 770 A.2d at 440, Passarelli, 94 R.I. at 159-160,179 A.2d at 331-332.
This Court has weighed the evidence, and has found the testimony of family members and medical personnel — including the testimonies of Mrs. Paiva's nurse, Cheryl Carney, her sister-in-law, Hilda Paiva Brasil, and her son, Antone, which all indicated Mrs. Paiva's desire to live out her life in her home and to distribute her property equally among her sons — to be compelling. See McEntee, 861 A.2d at 464; Findings of Fact,supra. The Court further finds that Brian used his fiduciary position, as well as his position as Mrs. Paiva's sole caretaker, to isolate her from the rest of the family by changing the telephone number, locking the doors against visitors, asking family members to leave, and ultimately seeking seven restraining orders against members of Mrs. Paiva's family. In addition, the Court finds credible the testimony of Katrina Paiva, which indicated that Brian used his position of trust to convince Mrs. Paiva, falsely, that his siblings sought to sell her home and place her in a nursing home. This Court is satisfied that Mrs. Paiva's fear of losing her home, her dependence upon Brian, and her misguided belief that he would protect her assets caused her to execute the Deed in his favor. Thus, the totality of the circumstances demonstrates that Brian's influence resulted in an unfair and unreasonable transfer of the property by the Deed to Brian. Because this Court finds that there was an unreasonable transfer of the property, Brian has failed to meet his burden by clear *Page 17 
and convincing evidence. See Passarelli, 95 R.I. at 159-160; see also Inre Adner G., 925 A.2d 951, 957 (R.I. 2007) (finding that "the clear and convincing standard requires that the fact-finder form a `clear conviction without hesitancy of the truth of the precise facts in issue'") (citations omitted). Therefore, the Court finds the Deed invalid.
 2 The Wills
The Court now examines the validity of the Second and Third Wills. Under G.L. 1956 § 33-5-10, a will is revoked by the existence of another properly executed will. To properly execute a will, the testator must be eighteen years of age and "of sane mind," G.L. 1956 § 33-5-2, and the will must be
 "in writing and signed by the testator, or by some other person for him or her in his or her presence and by his or her express direction; and this signature shall be made or acknowledged by the testator in the presence of two (2) or more witnesses present at the same time, and the witnesses shall attest and shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary, and no other publication shall be necessary." G.L. 1956 § 33-5-5
The Second and Third Wills in this case are not challenged as to their proper execution with respect to form. As to competence, this Court finds, based upon the testimonies of Attorney Lombardi and Attorney Illuzi, that Ms. Paiva was "of sane mind" when she executed both Wills.See G.L. 1956 § 33-5-2. However, the fact that a testator is of sound mind is insufficient to defeat a claim for undue influence.Caranci, 708 A.2d at 1324 (stating, "[w]eakness of mind, however, is not an essential element to a finding of undue influence, even though it may be relevant"). Therefore, other illegalities, such as undue influence, may render a will invalid even if the testator executes the will in proper form and does so with sound mind. If the subsequent will is invalid for any reason, it fails to revoke the properly executed will before it. See G.L. § 33-7-23 *Page 18 
notes; 25 A.L.R.2d 657. In such a case, the last valid will controls.See Reese v. Court of Probate, 9 R.I. 434 (1870). Therefore, this Court must determine whether the Second and Third Wills were invalid as the product of undue influence; thus, leaving the Original Will as the last valid will to control the distribution of Mrs. Paiva's property.
The Petitioners contend that the Passarelli standard for undue influence applies to wills in the same fashion as it applies to deeds. In support of this argument, Petitioners note that thePassarelli decision refers to "instruments" in setting the standard and not exclusively to "deeds."[5] See Passarelli, 94 R.I. at 159-160,179 A.2d at 331-332. The Petitioners have crafted an argument drawing "wills" within the traditional Black's Law Dictionary definition of "instruments" and extrapolating the terminology to find the standard applicable.[6] However, this Court is mindful of the majority rule that sets a separate standard for wills and deeds. See 25 Am. Jur. 2dDuress and Undue Influence § 47 (2006).
The seminal case on the issue of undue influence with respect to wills in Rhode Island is Caranci v. Howard, 708 A.2d 1321 (R.I. 1998). InCaranci, the testator was an elderly woman who had never married and who was survived only by distant relatives and several close neighbors.Id. at 1322. The testator met a tax assessor in the last five years of her life with whom she developed a fast friendship, leading to a joint bank account and a new will. Id. at 1322-1323. A neighbor and friend of the testator challenged the will as the product of undue influence.Id. at 1324. There, the Court found that the party contesting the will bears the burden *Page 19 
of proving undue influence by "a preponderance of the evidence."Id. This burden requires more of the contester than merely showing "suspicion, surmise, or conjecture." Caranci, 708 A.2d at 1327. However, because the act of coercion is often accomplished in secret, the party contesting the will may rely upon circumstantial evidence to meet his or her burden. Id. at 1324. Therefore, this Court must consider the evidence, including that which is circumstantial, in light of the possible factors for undue influence. See id. at 1324, 1328 (stating that factors such as the unnatural disposition of the decedent's property, combined with a relationship of trust between the testator and beneficiary, and the beneficiary causing the estrangement of the testator from other close relationships would raise at least an inference of undue influence).
In turning to the instant matter, this Court finds that there existed a clear fiduciary relationship as a result of Brian's holding Power of Attorney for his mother. This fiduciary position, as well as Brian's role as Mrs. Paiva's sole caretaker, establishes a relationship of trust and dependence between the testator and the beneficiary. Id. at 1324. Brian, therefore, had the opportunity to exert influence. SeeTinney, 770 A.2d at 438. This Court accepts the testimony of the Brothers that they did not intend to move Mrs. Paiva from her home, or to harm her in any way. Therefore, this Court finds that Brian's acts in changing the telephone number, ordering family members to leave, and ultimately seeking restraining orders against his family members, were all undertaken for the purpose of alienating Mrs. Paiva from the rest of the family. See Caranci, 708 A.2d at 1328. This Court further finds that Mrs. Paiva was extremely ill physically, was rapidly fading mentally, and was therefore susceptible to influence. See Tinney, 770 A.2d at 438. The Second and Third Wills both bequeathed the property unnaturally, giving a disproportionate amount of the estate to Brian and his friend, rather than dividing it among Mrs. Paiva's children. See Caranci,708 A.2d at 1324. For these reasons, this Court finds that the *Page 20 
Petitioners have met their burden of proving by a fair preponderance of the evidence that the Second and Third Wills were the product of undue influence.
Generally, a fair preponderance requires that the facts be shown to more likely than not support the contester's conclusion. Perry v.Alessi, 890 A.2d 463, 469 (R.I. 2006). This Court has considered Brian's argument that Mrs. Paiva was estranged from her relatives by her own choice and that she sought to reward Brian and Queenie's aid to her in her ailing months. Viewing the totality of the circumstances, this Court nonetheless finds that the Second and Third Wills were more likely than not the product of undue influence, and the burden has been met.See id. Because the Second and Third Wills are invalid, they fail to revoke the Original Will. Therefore, the Original Will of 1996 remains in effect.
The Court returns briefly to the Petitioners' contention that thePassarelli standard applies in wills cases. This Court finds no case law to support a distinction in the standard for proving undue influence for wills when the beneficiary of the will enjoys a relationship of trust and confidence with the testator (although such a relationship is a factor in determining whether undue influence occurred). Id. However, even if this Court should assume, arguendo, that the Petitioners are correct in their assertion that the Passarelli standard applies to the instant matter, this Court's conclusion would be the same.Passarelli requires the beneficiary, where a fiduciary relationship exists, to prove by clear and convincing evidence that the instrument was fair and reasonable, and the product of the grantor's voluntary action. See Passarelli, 94 R.I. at 159-160. This Court has found,supra, that a fiduciary relationship existed between Brian and Mrs. Paiva and that there are sufficient facts to support an inference that Brian unduly influenced Mrs. Paiva. It thus follows that Brian cannot prove by clear and convincing evidence that the Second *Page 21 
and Third Wills were fair, reasonable and the product of Mrs. Paiva's uninfluenced action. Therefore, under either standard, the Petitioners are successful in this claim.
The Rhode Island Supreme Court has determined that undue influence does not constitute an independent tort and, therefore, recovery is limited to equitable relief; there is no right to damages distinct from restitution. Lavoie, 918 A.2d at 229. For this reason, the appropriate remedy in this case is to void the Deed by declaratory judgment and to void the Second and Third Wills, allowing the Original Will to stand.
 B Abuse of Process
The final issue before this Court is whether the Brothers have proven that Brian's obtaining seven restraining orders against them constituted an abuse of process. The Brothers contend that Brian used the Power of Attorney to obtain restraining orders against his family members and to summon the Police to enforce these orders. Plaintiffs argue that Brian used this process for the wrongful purpose of excluding other family members from access to his mother and that this enabled him to influence the ultimate disposition of her property.
An abuse of process claim arises "when a legal proceeding, although set in motion in proper form, becomes perverted to accomplish an ulterior or a wrongful purpose for which it was not designed."Clyne v. Doyle, 740 A.2d 781, 783 (R.I. 1999); Hillside Assocs. v.Stravato, 642 A.2d 664, 667 (R.I. 1994). Such an action is akin to, but distinguished from, malicious prosecution. Id. In an abuse of process case, the Plaintiffs must show by "clear proof" that the process was undertaken with a wrongful motive or malice and that such action perverted the legal process once the process was set in motion. SeeBrough v. Foley, 572 A.2d 63, 66 (R.I. 1990); Hillside Assocs.,642 A.2d at 669. In general, the "gist of an abuse of process claim is the misuse of legal process to obtain an advantage, `not properly involved in the proceeding *Page 22 
itself. . . . [However], even a pure spite motive is not sufficient where process is used only to accomplish the result for which it was created.'" Palazzo v. Alves, 2008 R.I. LEXIS 33, *25 (R.I. 2008) (citations omitted).
This Court has found, supra, that Brian brought seven separate proceedings to obtain restraining orders against his Brothers and other family members, that he did so to estrange his mother from the rest of the family, and that he created this estrangement in order to influence Mrs. Paiva to execute the Deed and the Second and Third Wills to his benefit. With respect to Brian's motive for seeking the restraining orders, this Court considers Brian's argument that he sought the restraining orders for the proper purpose of protecting his mother. In evaluating the evidence, the Court accepts David's testimony that he did not fight with his mother in an inappropriate or threatening way, and this Court discredits Brian's testimony to the contrary. The Court accepts Tommy's testimony that he was attempting to resume his visit with Mrs. Paiva when he found the door locked and inadvertently broke the window. The Court finds incredible Brian's testimony that he felt threatened and believed Tommy's breaking the window was an act of vandalism, thus justifying his call to the Police. The Court is not persuaded that Steven made threats against Brian, as Brian and Shannon testified. The remaining restraining orders are neither explained nor justified. In light of these findings, and taking the evidence in whole, this Court finds clear proof to support a conclusion that Brian's motive for obtaining the restraining orders was to wrongfully alienate his mother from the family in order to influence her to draw the Deed and Wills in his favor. While mindful of the role that spite may have played in Brian's actions, this Court is satisfied that the motive for obtaining the restraining orders extended beyond mere spite, and was indeed to exercise undue influence in the creation of Mrs. Paiva's testamentary instruments. See Palazzo, 2008 R.I. LEXIS 33, *25 (R.I. 2008). Such *Page 23 
action resulted in the perversion of the legal process. See Brough,572 A.2d at 66; Hillside Assocs., 642 A.2d at 669.
The Petitioners request the Court to order $35,000 in compensatory damages for the abuse of process claim. They contend that this amount represents the amount of legal fees paid by the Brothers. This Court will award damages in the amount of legal fees paid, conditioned upon the Petitioners' providing an affidavit subsequent to the filing of this Decision to support their claim, and upon this Court's determination after hearing objections to Petitioners' request for fees.
 IV Conclusion and Judgments of Law
Pursuant to Super. R. Civ. P. 58, this Court enters the following judgments:
 1. The Deed of July 19, 2005, conveying real estate to Brian Paiva, is declared null and void.
 2. The Second and Third Wills of June 14, 2005 and May 2, 2005, respectively, are declared null and void.
 3. The Original Will of October 31, 1996 is declared to be the Last Will and Testament of Catherine Paiva.
 4. Judgment for abuse of process and damages in the amount equal to reasonable attorney's fees paid shall be entered against Brian Paiva in favor of the Brothers, plus interests and costs, jointly and severally, after submissions of affidavits in support thereof and after hearing on any objections thereto.
Counsel shall submit the appropriate order for entry.
[1] This Court uses first names throughout this Decision for purposes of clarity. No disrespect to the parties is intended.
[2] The Brothers specifically allege that only the Third Will is invalid and that the Original Will represents the intended distribution of the estate. However, in Rhode Island law, the substance of the complaint, rather than the form, governs the relief sought. See Bragg v.Warwick Shoppers World, 102 R.I. 8, 11, 227 A.2d 582, 584 (1967). (finding that Rule 8 of the Rhode Rules of Civil Procedure require that the plaintiff make only a short and plain statement of the claim and thus emphasizes substantial justice over the exact formulation of issues). Therefore, although the Brothers do not specifically allege that the Second Will is invalid, because of the time frame of undue influence alleged and represented by the evidence in this case, and because the Brothers contend that the Original Will is the valid will to be revived, the Court will interpret the complaint to include that the Second Will is also invalid and not a candidate for revival. Only the Original Will and Third Will were brought before the Probate Court, and the parties stipulated that the Third Will was valid for the purposes of probate, agreeing that the matter would be appealed to this Court.
[3] As the Georgia Supreme Court has noted, "[i]n all history nothing has so wrung the parental heart with grief as the belief that a child is undutiful, unworthy, and unloving. Love has led to the greatest tragedies." Stephens v. Bonner, 174 Ga. 128, 133 (Ga. 1932). Such is the case here.
[4] The Petitioners contend in their post-trial papers that Brian violated his fiduciary duty by assigning the Insurance Policies to Shannon. However, this issue was not alleged in the complaint as either abuse of process or as a separate count. Therefore, the Court will address this issue only as it provides evidence of Brian's influence and motive for financial gain, not as an independent issue.
[5] The Passarelli standard: "[o]rdinarily, one who seeks the cancellation of an instrument bears the burden of establishing his right thereto by clear and convincing evidence. . . . However, where a relationship of trust and confidence exists between grantor and grantee, it is generally held that the burden is on the grantee to establish that the transfer was the deliberate and voluntary act of the grantor and that the transaction was fair, proper, and reasonable in all circumstances." Passarelli, 94 R.I. at 159-160, 179 A.2d at 331-332
(emphasis added).
[6] Black's Law Dictionary defines "instrument" as "[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a contract, will, promissory note or share certificate." BLACK'S LAW DICTIONARY 813 (8th ed. 2004). Petitioners contend that because "wills" clearly fall within the "black letter law" definition of instruments, the Rhode Island Supreme Court intended that the standard in Passarelli apply to wills.